GUNTHER *et al.* *v.* LIVERPOOL & LONDON & GLOBE INS. Co.

*(Circuit Court, E. D. New York.* March 17, 1888.)

INSURANCE—CONDITIONS OF POLICY—WHAT CONSTITUTES BREACH.

A policy of insurance containing a clause that kerosene shall not be stored on the premises insured, excepting to use for lights, if the same be drawn and the lamps filled by daylight, to which is attached two riders, bestowing the privilege of keeping not exceeding five barrels of such kerosene, and using it for lights on such premises, provided the lamps are trimmed and filled by daylight, is avoided by drawing kerosene by lamplight to loan to a neighbor, causing an explosion by which the entire building was burned.

At Law. On motion for new trial.

Action by Amelia A. Gunther, executrix, etc., and others against the Liverpool & London & Globe Insurance Company on a policy of insurance issued by such company.

*C. Bainbridge Smith,* for plaintiffs.

*William Allen Butler,* for defendant.

LACOMBE, J. When the testimony in this case was closed, defendant moved for the direction of a verdict. The court was inclined to grant such motion on the ground that it appeared by uncontradicted evidence that the cause of the fire was the drawing of kerosene by lamplight. Inasmuch, however, as much testimony had been introduced bearing on another defense, viz., the presence or use of gasoline or benzine on the premises, the motion was denied, with leave to renew after verdict as a motion for direction of judgment. All question as to the drawing of kerosene by lamplight was withdrawn from the jury, and upon plaintiffs' case, and the other defense, their verdict was for the plaintiffs. The defendant now moves for a new trial on the same ground as that urged when the case was closed; not making the motion reserved to it, for the reason that such motion is "not in consonance with federal practice," because a compulsory nonsuit is not permitted here, and its practical equivalent—the power to direct a verdict—does not exist after verdict rendered. Under the authorities it is no doubt true that the very same process by which a state judge nonsuits a plaintiff on the whole case on grounds of law, is called the "directing a verdict," when practiced by a federal judge. *Oscanyan* v. *Arms Co.*, 103 U. S. 261. It would be matter of regret, however, if the federal courts should by sticking in the bark of mere verbal dialectics be unable, despite section 914, Rev. St., to avail themselves of a state practice so simple, sensible, and efficient as that of directing judgment of nonsuit upon reserved points of law after verdict. *Shepherd* v. *Bishop*, 6 Bing. 435; *Downing* v. *Mann*, 3 E. D. Smith, 36; *Insurance Co.* v. *Minard*, 2 N. Y. 98; *Shellington* v. *Howland*, 53 N. Y. 371. By the refusal of the court, however, to charge his last five requests, and by the denial of his motion to direct a verdict in his favor, counsel for the defendant is entitled to apply for the relief he now asks.

Neither the plaintiffs' extended argument, nor a careful examination of the authorities cited in his brief, has altered the opinion expressed on

the trial. The circumstances under which the fire originated were these: On August 15, 1879, two servants belonging to the Bath Park Hotel, situated about a mile distant, came to Walker, the proprietor and occupant of the insured premises, to borrow some kerosene oil. [There was considerable conflict of testimony as to whether it was kerosene or gasoline which they came to get; but the jury has found that there was no gasoline on the premises, and this motion will therefore be determined upon the assumption that the oil on the insured premises was kerosene.] Their request was acceded to, and they were referred by Walker to one of his employes, who was directed to supply their need. With two common open wooden pails, which they had brought to carry the oil in, and accompanied by Schuchart, Walker's employe, carrying a lighted lantern, the Bath Park employes went to the "oil-room." In this room, which was generally under Schuchart's charge, there was a barrel of kerosene, a can, some old rubbish, and a stand on which lamps could be filled. It was under what was known as the "pavilion," its floor a foot or so below the level of the ground, apparently without a window, and entered by a narrow door. Schuchart first set his light—an ordinary stable lantern, with holes in the top—upon the door-sill, and began to draw into the pails. The first of these leaked; considerable oil was spilled, and its contents were then poured into the second pail. About this time the lamp was brought from the door-sill nearer to the barrel, and shortly afterwards — only a few minutes after the party entered the oil-room—there ensued an explosion and conflagration by which the premises were totally destroyed. There was some conflict as to the precise time of explosion, but all the testimony showed that it was about dusk, darker in the oil-room than it was outside, and there is no dispute but that the oil was not being drawn by daylight only.

Is a loss so caused covered by the policy? It is undoubtedly true that written clauses and riders will prevail over the ordinary printed forms of insurance contracts, and that, as the contract is an instrument prepared by the insurer, all doubts or ambiguities are to be resolved against him. But the two essential rules of interpretation, which are the headlights under which all written instruments should be construed, are just as applicable to contracts of insurance as to any other agreements,—the whole document must be considered, and it must be construed so as to give effect to the intent of the parties as indicated by the language employed. The contract in suit, which covered a summer hotel, used as a dwelling-house in the winter season, was on one of the ordinary printed forms of policy used by the defendant. It contained, as such policies usually do, many carefully drawn provisions, paragraphed and numbered, restricting the operation of the contract, and saving the company from claims for loss arising under circumstances which exposed them to some unusual hazard which they were not willing to accept. One of these paargraphs is as follows:

"11. * * * Petroleum, rock, earth, coal, kerosene, or carbon oils of any description, whether crude or refined, benzine, benzole, naphtha, * * * or any other inflammable liquid are not to be stored, used, kept, or allowed on

the above premises, temporarily or permanently, for sale or otherwise, unless with written permission indorsed on this policy, excepting the use of refined coal, kerosene, or other carbon oil for lights, if the same is drawn, and the lamps filled, by daylight.   Otherwise this policy shall be null and void."

This paragraph declares its meaning with no uncertain sound.   First, it absolutely prohibits, except upon written permit, the "storing, using, keeping, or allowing" of kerosene and certain other oils on the premises, temporarily or permanently, and for any purpose whatever, ("for sale or otherwise.")   It next makes an exception in favor of kerosene, but with clearly expressed restrictions: (*a*) The kerosene so kept is to be used for lights.   It is not to be kept " for sale," or kept or used " otherwise," except for lights; and manifestly for lights on the insured premises.  (*b*) The kerosene which might thus be kept " for lights " is to be drawn by daylight. (*c*) The lamps in which the kerosene kept "for lights" is burned must be filled by daylight.   (*d*) As to any other manipulation of kerosene which is necessary to its use "for lights," the paragraph above quoted is silent.   The next inquiry is whether elsewhere in the contract there is anything so inconsistent with the terms of this paragraph as to make the meaning of the contract doubtful even; for doubts will be resolved against the insurer.   The general description of the property, viz.: " The two-story frame hotel building, with one-story frame kitchen and two-story pavilion adjoining and communicating, situate on Gravesend Bay at Bath, Kings Co., L. I., [it is understood the above property is to be occupied by a family when not in use as an hotel]"—is certainly not inconsistent with a provision restricting the keeping and use of kerosene to the single purpose of lighting the premises.   In that respect the case at bar differs from the *Harper Cases* and the others cited, where the ordinary use of such premises, as the policy described or the survey disclosed, was inconsistent with the restrictions of the printed form.   Nor does the provision as to special means of lighting, which was written in with the description of the premises, present any such inconsistency. The "privilege to use gasoline gas, gasometer, blower, and generator being under ground about sixty feet from main building, in vault; no heat employed in process,"—does not import that the insured may not also use kerosene for lighting the premises under the conditions of the policy, nor imply that he may keep or use it for any other purpose or in any other way.

It further appears that at the time of issuing the policy there was attached to it a rider containing a customary privilege attached generally to policies, and expressed as follows: "Privileged to use kerosene oil for lights; lamps to be filled and trimmed by daylight only."   What effect has this upon the provisions of paragraph 11, above quoted?   In the first place it imposes an additional restriction upon the insured, for it forbids the "trimming" of lamps except by daylight.   Paragraph 11, by its silence, permitted trimming—an operation not wholly free from danger when conducted by artificial light—at any time.   The rider is thus susceptible of intelligent interpretation, without finding its sole meaning in the endeavor to dispense altogether with the kerosene clause

of the policy. In view of the rule of construction which requires us to consider the whole contract, the meaning of this rider is to be determined only after its terms are collated with those of paragraph 11, above quoted. When this is done, it will be at once seen that there is nothing in it which will warrant the contention that kerosene may be kept "for sale," or kept or used "otherwise" than for lighting the premises. These buildings certainly could not be used as a store-house from which might be obtained the oil necessary to light some other premises, even if those other premises were used by the assured. The lights in which the kerosene,—which the assured was thus authorized to keep,—was to be burned, were to be filled with that kerosene by daylight only. The rider is silent as to drawing. The sounder interpretation would seem to be that, as to drawing, the original form, being unmodified by any inconsistency in the rider, should control; but even if the effect of silence in the rider on that subject is to make the whole contract silent as to the time of drawing kerosene under the privilege, then the utmost that can be claimed for the privilege given to the assured under the rider and contract is this: "You shall not," says the insurer, "keep or use kerosene oil for sale, or for any other purpose except that of lighting the premises. As to the oil which you thus use for lighting, you must not pour it into your lamps except by daylight; but we do not care when you draw the kerosene which we thus allow you to fill your lamps with." In view of the testimony in this case, such a clause would probably have afforded abundant protection to the insurer. If the lamps were not to be filled except by daylight, no one would be likely after dark to draw oil, which could not be poured into them till the next morning. And no one who was drawing oil with which to fill the lamps of that hotel would be likely to draw it in an open wooden pail, or otherwise than into a can such as might be thereafter conveniently used as an instrument for filling the lamps. The expert testimony shows that such a mode of drawing would be quite safe, and that it is only the agitation and exposure of a broad surface of the liquid which renders the presence of a light dangerous. The kerosene oil which took fire in this case, however, was being drawn for no such purpose; and the language of the rider cannot be stretched so far as to cover a loss caused as this was, by operations not allowed by the policy.

Finally, plaintiffs sought to sustain their case on the terms of another rider, written on the margin of the policy, at the close of the season of 1878, when the assured decided to give up lighting any part of the premises with gasoline. It reads as follows: "Privileged to keep not exceeding five barrels of kerosene oil on said premises." There is nothing in this clause, however, at all inconsistent with the restrictions as to drawing which the policy contains. Nor does it at all import a keeping for any purpose other than that already provided for, viz., the lighting of the premises. It merely provides how much kerosene may be kept under the general license to keep, implied in the kerosene clause and the rider. It is not concerned either with the uses or manipulation of the oil so kept. The clause and both riders stand perfectly together.

The motion should be granted; and if, under the federal practice, a judgment cannot now be directed for the defendant on the point reserved, a new trial will be ordered.