## WOLFE et al. v. INTERNATIONAL RE-INSURANCE CORPORATION.

### No. 28.

Circuit Court of Appeals, Second Circuit.
Nov. 5, 1934.

### No. 122.

Circuit Court of Appeals, Second Circuit.
Nov. 5, 1934.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

PER CURIAM.

This case involves the same question that was before the court in United States v.

268

Alfred C. Bennett, of New York City (Malcolm C. Law, Francis R. Stoddard, and Daniel S. Murphy, all of New York City, of counsel), for appellant.

Robert J. Sykes, of New York City (William C. Morris and John J. Clarke, both of New York City, of counsel), for appellees.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

This action is in contract to recover for services rendered to the defendant in procuring for it a "reinsurance treaty" between itself and the United States Casualty Company, by which the defendant received certain unearned premiums and assumed the corresponding risks underwritten by that company. Though the existence of any agreement to pay for these services was in issue at the trial, we are to take it after verdict that the defendant, through its president Hansen, orally promised Wolfe, one of the partners in the plaintiff firm, that the firm should have two and a half per cent. of the gross unearned premiums on any risks which the defendant assumed by the proposed "treaty." The principal defence upon this appeal, and the only one which we need consider, arises from the conflicting relations of the plaintiffs to both their principals. They were a firm of accountants, and it had been their practice for a number of years to make periodic audits of the Casualty Company's books and to give it advice, for which services they were receiving an annual retainer. Late in the year 1931 they had made such an audit which showed in Wolfe's judgment an undue amount of outstanding risks. This opinion he expressed to some of the company's officers and suggested that its annual statement would better answer the requirements of the New York Superintendent of Insurance if its underwritings were reduced. Wolfe suggested to Hansen, the defendant's president, that he take over some of the company's risks, and finding him favorably disposed, drew up in writing the outlines of a proposed "treaty," one copy

of which he submitted to the company's officers with the addendum: "How does this look to you as the basis on which to talk to Hansen?" They agreed that it would serve, and Wolfe thereupon arranged an interview between Hansen and one, Meador, an officer of the company, at which he too was present. We may assume, arguendo, that at this talk Wolfe was merely an observer, taking no part, and leaving Hansen and Meador to arrange their own terms on their own basis. The evidence does not quite go so far as that; Wolfe shared in the discussion, making suggestions on behalf of the company, and advising Hansen at least once; but as this evidence is scanty, and as its effect is not vital in the result, we pass it. Later Hansen sent to the company a draft of the proposed "treaty," embodying as he understood them the terms orally agreed to; in Wolfe's judgment it was the worst document of the kind he had ever seen, and when he took it to the president, the secretary and the attorney of the company, they agreed, not only that it was generally defective, but that it did not even conform to the agreement. Hotchkiss, the attorney, told Wolfe that he ought to draw a proper "treaty," being more experienced in such matters than Hotchkiss. Let him do so and Hotchkiss would go over it with him. Wolfe agreed, dictating a number of new clauses, and changing those which Hansen had drafted. He submitted his draft to the officers, who took it home for consideration, and on the next day went over it with Wolfe. In concert they all prepared a final draft which they submitted to Hansen, who at once accepted it. During all this time the officers did not know that Hansen had agreed, in case the bargain should go through, to pay the plaintiffs the commission for which they are now suing.

These facts, proved without dispute, indeed for the most part out of Wolfe's own mouth, were the defendant's defence to the contract. Its theory was that Wolfe, being actively engaged as an agent of the Casualty Company in draughting the "treaty," if in nothing earlier, had put himself in a crossfire of duties by accepting a commission from Hansen, which made impossible that unmixed allegiance on which the law insists; and that although the defendant was not the injured party, it might vicariously adopt the grievance of the Casualty Company. The plaintiffs argued that though they were indeed the agents of both parties, still Wolfe was merely a go-between and owed no active duty of counsel or other assistance to the Casualty Company; that the terms were all settled be-

tween the two principals independently; and that their prospective commission from Hansen could not have affected the discharge of duties which did not exist. The judge took this view and refused to dismiss the complaint, or even to leave the question to the jury upon two very obscure requests. The defendant appealed.

■ The legal consequences of an agent's acting for two principals, adversaries in a transaction, are not a priori demonstrable from the mere fact that he cannot in such a position be loyal to both. It does not follow that he should not recover for his services to the principal who knew that both had employed him, and it is almost universally held that he may recover from both, if both knew. The law might have been that though the ignorant principal might recover from the agent any commissions collected, on the notion that they were received upon a constructive trust, the informed principal, who had no grievance of his own, must perform. Some cases have indeed taken that view, directly or by implication, though without any adequate discussion. Jarvis v. Schaefer, 105 N. Y. 289, 11 N. E. 634 (semble); Raisin v. Clark, 41 Md. 158, 161, 20 Am. Rep. 66 (semble); Felbel v. Kahn, 29 App. Div. 270, 51 N. Y. S. 435; Reis Co. v. Post, 183 App. Div. 696, 170 N. Y. S. 610. And indeed, the only ground for going further is that the agent's conduct is so serious a breach of morals as to taint the whole transaction; to make it one in which the court will not meddle at all, but leave the loss where it falls. That is indeed a rather extreme position and we are not sure we should have taken it as an original matter; at least unless the agent's services to the informed principal necessarily implied faithlessness to the other. Generally it might have been enough merely to subject him to the surrender of his commission to the ignorant principal. However, we are committed to the other doctrine by Reilly v. Beekman (C. C. A.) 24 F.(2d) 791, and the weight of authority is in accord. Bollman v. Loomis, 41 Conn. 581; Rice v. Wood, 113 Mass. 133, 18 Am. Rep. 459; Auerbach v. Curie, 119 App. Div. 175, 104 N. Y. S. 233; Lynch v. Fallon, 11 R. I. 311, 23 Am. Rep. 458; Deakin v. Scheuer, 182 Wis. 234, 196 N. W. 222; Gray v. Pankey, 211 Ala. 539, 100 So. 880; Everhart v. Searle, 71 Pa. 256; Eaton v. Clabaugh (C. C. A. 6) 251 F. 575 (semble); Friar v. Smith, 120 Mich. 411, 79 N. W. 633, 46 L. R. A. 229 (semble). In the end the question is how reprehensible morally the agent's conduct appears to be, a matter on which men are likely to differ, and which can be determined, so far as it can be determined at all, only by consensus of feeling. We conclude therefore that it is of no moment that the principal who is being sued knows of the agent's equivocal status; he may defend unless both know. In pari delicto potior est conditio defendentis.

■ There remains the question on which the judge decided the case; whether the plaintiffs were mere go-betweens, under no duties with whose performance their interest in the event would interfere. That is a well recognized exception. McLure v. Luke, 154 F. 647, 24 L. R. A. (N. S.) 659 (C. C. A. 9); Eaton v. Clabaugh, supra (C. C. A.) 251 F. 575; Rupp v. Sampson, 16 Gray (Mass.) 398, 77 Am. Dec. 416; Knauss v. Gottfried Krueger Brewing Co., 142 N. Y. 70, 36 N. E. 867; Rosenbaum v. Sarasohn, 184 App. Div. 204, 171 N. Y. S. 629. No doubt the result should depend only upon those duties which the agent owes to the ignorant principal; but that test will not help the plaintiffs here. From what we have said it is plain that Wolfe had undertaken to give active help and advice to the Casualty Company at least in draughting the "treaty"; that called for his detached, impartial judgment. Hotchkiss, whatever his own qualifications for the work, turned this part of the transaction over to Wolfe as more experienced than he; and Wolfe when he accepted the task, had disqualified himself for it by his agreement with Hansen. It makes no difference whether the Casualty Company was to pay him or not; nor need we say whether his place in the earlier negotiation was also enough to defeat him; we can rely upon his preparation of the document alone.

■ It is true that the defendant did not plead these facts, and we may assume without deciding that if seasonable objection had been made, the evidence which established the defence should have been excluded. Milbank v. Jones, 127 N. Y. 370, 28 N. E. 31, 24 Am. St. Rep. 454. But it was the plaintiffs themselves who brought it out, and it is at least open to question in such a case whether the court should not take the point sua sponte. Oscanyan v. Arms Co., 103 U. S. 261, 266–268, 26 L. Ed. 539. Be that as it may, when at the close of the whole case the defendant moved to dismiss the complaint for this reason, the plaintiffs did not suggest that the issue was not in the case, but were content, so far as appears, to meet it. They could scarcely have been surprised, for, as we have said, the testimony all came from them; and as to the question of law which it raised, the judge gave both sides time to prepare their argu-

ments. In such a setting it would have been an idle formality to insist upon an amendment, and much worse now to deny relief, when the plaintiffs had not even demanded that the formality should be observed.

Judgment reversed; new trial ordered.