M., K. & T. RAILWAY COMPANY vs BOWLES.

Opinion delivered June 8, 1897.

*1. Interstate Commerce—Territories.*

The Act of Congress approved February 4, 1887, in relation to Interstate Commerce applies to unorganized territories as well as states and organized territories, and a shipment of freight

from Indian Territory to another state or territory is governed by that Act.

2. *Interstate Commerce Law—Evasion.*

A rate for carrying "hay" applies to all hay and the interstate commerce law cannot be evaded by shipping as "old hay" at less than the established rate. Hay is a generic term.

3. *Unlawful Contracts.*

A contract made in violation of the Interstate Commerce law is unlawful, and the courts will not enforce an agreement or contract for the benefit of one through whose direction or advantage the law is violated or public policy contravened.

4. *Forbidden Contract—Public Policy.*

A party to a contract forbidden by law, which gives one a rate on an interstate shipment less than the regular rate, can not recover the difference from a railroad company which demands a further rate before delivery of the goods.

Appeal from the United States Court for the Central District.

YANCEY LEWIS, Judge.

Action by R. P. Bowles against M., K. & T. Railway Company. Judgment for plaintiff. Defendant appeals. Reversed and dismissed:

On the 22d day of February, 1896, R. P. Bowles, the plaintiff below and appellee in this court, filed a complaint in the United States Court of the Central district, at Atoka, Ind. T., which complaint alleges that on the 26th day of July, 1895, the defendant company, the Missouri, Kansas & Texas Railway Company, did, through its local agent, agree with the plaintiff to transport from the town of Cale, in the Indian Territory, to the city of St. Louis, Mo., six car loads of hay, cut, baled, and put up during the year 1894, at the

rate of 15 cents per hundredweight. The minimum weight of each car of hay was to be 17,000 pounds, for which the plaintiff was to pay the said rate of 15 cents per hundredweight on each of said six cars of hay; that the defendant received this lot of six car loads of hay, and shipped the same to consignee of the plaintiff at St. Louis, Mo., but that the local agent of the defendant company at St. Louis charged the consignee the sum of 25 cents per hundredweight, instead of 15 cents, and also estimated the minimum weight for each car at 20,000 pounds, and that the excess so charged amounted to the sum of $137.10; that this amount was in excess of contract price; and for that amount plaintiff prayed judgment. The defendant company on the 14th day of March, 1896, filed its answer to this complaint, in which it denied that the defendant, through its local agent, agreed to transport the said six car loads of hay from Cale, Ind. T., to the city of St. Louis, Mo., at the rate of 15 cents per hundredweight, and denied that the minimum weight of each car of hay was to be 17,000 pounds, and admitted that the hay was transported as alleged, and that 25 cents per 100 pounds on a minimum of 20,000 pounds per car was charged as alleged, but denied that the amount was an overcharge as to rate, or as to minimum weight, and denied that the defendant overcharged plaintiff the sum of $137.10, or any other sum, on account of the shipment of said hay, and denied that the same was fraudulently or erroneously collected from the agent of the plaintiff, and denied that said sum is now due the plaintiff, as the difference in the rate agreed to and the rate collected, and the difference between the actual weights and the minimum of 20,000 pounds charged and collected by said defendant company. On July 26, 1895, appellee delivered to the appellant at Cale, Ind. T., for shipment to St. Louis, Mo., six car loads of hay. A separate bill of lading in duplicate was prepared and issued for each car, all being of the same general tenor, and being the

general printed form of said railway, filled out by the plaintiff, Bowles, and was in the nature of a contract of shipment, and was signed by the railway company's station agent. The bills of lading contained the usual conditions and regulations for shipment, and marginal marks were inserted to indicate the address of the consignee, the number of the car, and the number of pounds of hay in each car. These bills of lading, the duplicate copies, were retained by the agent; and under the shipper's statement of 17,000 pounds, on the copy retained by him, he inserted the letters "M. or L.," meaning "more or less," which bills of lading contained this stipulation: "It is expressly understood and agreed that the weights and classifications as set forth in the margin are subject to correction." No rate is shown on any of the bills of lading, but the published tariff rate on hay from Cale, Ind. T., to St. Louis, Mo., was 25 cents per 100, 20,000 pounds minimum per car; there being a higher rate per 100 on less than car loads. The cars were delivered to consignee in St. Louis, Mo., who paid under protest the freight bills rendered at the rate of 25 cents per hundredweight, and the minimum of 20,000 pounds per car. The shipper, Bowles, the appellee in this court, claims that he had an oral agreement with Morrison, the company's station agent at Cale, Ind. T., and his predecessor, D. J. Connell, by which he was to be given a 15-cent rate per hundredweight, with 17,000 pounds minimum per car; and this suit is to recover, as overcharge, the difference between the amount charged and collected by the railway company, on a basis of its regular published tariff rates, and the amount calculated on the 15-cent rate under the alleged oral agreement. The evidence is conflicting as to whether Bowles had an agreement with the station agent for a 15-cent rate, but appellee insists that such oral agreement was entered into. The evidence is also conflicting as to whether the station agent had any special or general authority from his superior officers of the company to make

or give a rate lower or different from the rate filed with the interstate commerce commission; but appellant insists that, if there was any such oral understanding or agreement, it was superseded and merged into the bills of lading or contract subsequently entered into. Each bill of lading provided that the articles shipped were to be transported over the line of the appellant's railway "under the following con ditions and general rules and regulations of the railway company's published tariffs." The usual conditions are set forth in the bills of lading, but it is not necessary to mention any of them except the one by which it was "expressly understood and agreed that the weights and classifications as set forth in the margin are subject to corrections." On the trial of the case the jury returned a verdict for the plaintiff below (the appellee in this court) for the sum of $137.10, being the amount of overcharge claimed as the difference between the rate of 25 cents per hundredweight, 20,000 pounds minimum per car, and the rate of 15 cents per hundredweight, 17,000 pounds minimum per car. There is no claim for damages to the hay shipped, or for any delay in its shipment.

*Clifford L. Jackson* and *Joseph M. Bryson*, for appellants.

1. If appellee had any oral agreement for a special rate less than the regular published tariff rate, the same was waived and merged in the written contract subsequently entered into between himself and the railroad company Hutchinson on Carriers, § 126; Lawson on Contracts of Carriers, § 102; McFadden vs Mo. Pac. Ry. Co., 92 Mo. 343.

2. The railroad company could not lawfully make a rate to Bowles of less than the regular published rate, and Bowles could not lawfully accept such rate. Act of Congress of February 4, 1887, as amended March 2, 1889, February 10, 1891 and February 11, 1893; U. S. vs Mich. Cen. Ry., 43 Fed. 26. Appellee is seeking to enforce an alleged contract made in violation of the letter and spirit of the law. Such contract is void, and that he cannot recover upon it, is well

settled.    Hefley vs G. C. & S. F. Ry. Co., 158 U. S. 98; Gerber vs Wabash Ry. Co., 63 Mo. App. 143; Hubbell vs Ry. Co. 38 Pac. 266; Trinity Lumber Co. vs M., K. & T. Ry. Co., 21 S. W. 290.

3.    The Indian Territory is a Territory within the meaning of the Interstate Commerce Law.  Act of May 2, 1890; 26 U. S. Statutes at Large 81; In re Lane, 135 U. S. 443; Texas & Pac. Ry. Co. vs Avery, 33 S. W. 704.

4.    Whether or not the Indian Territory be considered as a "Territory" within the meaning of the Inter State Commerce Law, the shipment from Cale, I. T. to St. Louis, Mo., was an interstate shipment.    The shipment was through both the state of Kansas and the State of Missouri. The line of the M., K. & T. Ry. Co. extends from Cale northward through the Indian Territory to Kansas; thence through Kansas into the State of Missouri.   This Court will take judicial notice of the route and location of this railway. G. C. & S. F. Ry. Co. vs State, 10 S. W. 81; Miller vs Railway Co., 83 Tex. 518; T. & P. Ry. Co. vs Black, 27 S. W. 118; G. H. & S. A. Ry. Co. vs Johnson, 29 S. W. 428.   C. N. O. & T. Ry. vs Interstate Commerce Commission, 162 U. S. 184; Houston Nav. Co. vs Ins. Co. 32 S. W. 889.

*G. A. Pate* and *R. L. Williams*, for appellee.

1.    Where parties to a contract have not put all of the terms in writing evidence of its supplementary terms is admissible to complete the contract.    Lawson on Contracts, § 378, M. & M. R. R. Co. vs Jurey, 111 U. S. 584; Malpas vs London R. R. Co., L. R. 1 C. P. 336.

2.    If appellee participated in any way in appellants wrong, it was induced by appellant, and it is bound, inter partes by such acts.    Lawson on Contracts, § 54; McBlair vs Gibbs, 17 How. 237.

3.    The Indian Territory does not occupy the relation of a territory of the United States, within the meaning of the Interstate Commerce Law.   U. S. vs Cox, 18 How. 100;

The Abbotsford vs Johnson, 98 U. S. 440; McCool vs Smith, 66 U. S. 459; Dailey vs Burke, 28 Ala. 328.

SPRINGER, C. J. (after stating the facts.) Counsel for appellant assign errors in this case as follows: First, that the trial court erred in refusing to instruct the jury to return a verdict for the defendant, as requested. The second, third, and fourth errors assigned are substantially the same, the only difference in each being as to the time before or after shipment when changes could be made in the rate as filed with the interstate commerce commission. The second instruction asked by the appellant was as follows: "If the jury find from the evidence in this case that the defendant filed with the interstate commerce commission its tariff rates on hay, and that said tariff rates so filed with the said interstate commerce commission covered the tariff rate on hay from the station of Cale, Indian Territory, to the city of St. Louis, Missouri, and that said tariff rate on hay was printed and publicly posted at said station of Cale for the informa· tion and inspection of the public, and that in accordance with such tariff rate so filed with said interstate commerce commission, and so printed and posted, the rate on hay was fixed and established at 25 cents per 100, with a minimum weight of 20,000 pounds per car, and that such tariff rate was on file with said interstate commerce commission at the time the hay in controversy was shipped, and that there had been no reduction in said tariff rate for a period of three days before the shipment of the hay in controversy was made, and if you further find that the defendant only collected from plaintiff an amount of money not exceeding the rate of 25 cents per 100, with a minimum of 20,000 pounds per car, then you must find for the defendant in this case." The court refused to give this instruction, and the appellant duly excepted. The fifth error assigned was to the effect that the trial court erred in instructing the jury as follows: "If you believe from the evidence that on the 26th day of July, 1895, the

defendant company was a common carrier of goods from Cale, Indian Territory, to the city of St. Louis, in the state of Missouri, and that, as such common carrier of such goods and chattels as aforesaid, it did, through its local agent, on the day herein mentioned, agree with this plaintiff to transport and safely convey from the said town of Cale, Indian Territory, to the city of St. Louis, Mo., six car loads of hay, cut, baled, and put up duriny the year 1894, at and for the rate of 15 cents per hundredweight, and the minimum of each of said cars of hay was to be 17,000 pounds, for which the plaintiff was to pay the said rate of 15 cents per hundredweight, as a suitable freight or compensation for transporting said hay as aforesaid, and if you believe that the agent of the railway company making such contract was acting in the scope of his authority in making such contract, having been thereunto authorized by the defendant railway company, and if you further find that the defendant railway company upon said six cars made a charge in excess of that stipulated in the contract, or upon any one of such cars, or any part of said cars, made an overcharge in excess of said contract, then you will find for the plaintiff the difference between what the charge would have been at the rate of 25 cents per hundredweight on so many of the cars as you find there was an overcharge, and a minimum of 17,000 pounds per car.'' The sixth and seventh errors assigned were to the effect that the court erred in refusing to grant a new trial.

The instructions which were given and refused in this case present very clearly the contention of the counsel in this case, and the issue involved in this appeal. There is evidence in the record tending to show that the oral agreement was entered into between the shipper and the company's station agent at Cale, Indian Territory, by which the company agreed to ship the hay mentioned in the bills of lading at a rate of 15 cents per hundredweight,—17,000 pounds

(19)

minimum per car; but it is not denied that the bills of lading which were delivered at the time contained the stipulation that the hay was shipped "under the general rules and regulations of the railway company's published tariffs," and "that the weights and classifications as set forth in the margin were subject to correction." In view of the position which the court has taken in this case, it is not necessary to determine whether the alleged oral agreement was merged into the written contract of shipment.

Interstate
Commerce
Law—Evasi-
on.

The contention of appellee's counsel that the interstate commerce rate was for "hay," while the oral agreement was in reference to "old hay," and therefore did not apply to the shipment in question, is untenable. "Hay" is the generic term, and covers all kinds of hay, as the word "corn" would cover new corn as well as old corn. The contention of appellee's counsel that appellee was in delicto himself, but not in pari delicto, is also not tenable. If there was an oral contract entered into, it must have been upon a basis upon which the minds of both the contracting parties met, and if so, and the contract upon which they entered was one forbidden by law, whether they had knowledge of that fact or not, they were both in pari delicto. Neither the ignorance of one or both of the parties, nor finely drawn subtleties as to which of the parties was more in fault than the other, change their legal status or their liability. If the contract which they entered into was prohibited by law, they were both at fault, and the courts will not give validity to or carry into effect such a contract.

The question, therefore, which we have to determine in this case, is whether it is competent for the railway company to make or the shipper to accept a rate for the transportation of freight which is greater or less than that which has been filed with the interstate commerce commission, and whether such rates are applicable to points in the Indian Territory. Counsel for appellee contends that the interstate

commerce law does not apply to the Indian Territory. The act of congress entitled "An act to regulate commerce," approved February 4, 1887, provides, among other things, that said act shall apply: "For a continuous carriage or shipment from one state or territory of the United States, or the District of Columbia, to any other state or territory in the United States, or District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through any foreign country to any other place in the United States." 1 Supp. Rev. St. U. S. p. 529. Counsel for appellee contend that the words "territory of the United States," used in this act, apply only to the organized territories, and that, as the Indian Territory is neither a state nor an organized territory of the United States, the interstate commerce act does not apply to the Indian Territory. In order to ascertain the intent of congress, we must consider the whole text of the bill, and the object for which it was enacted. The words "from any state or territory of the United States" having been used in the first part of the section, subsequently the act refers to "any place in the United States to an adjacent foreign country, or from any place in the United States through any foreign country to any other place in the United States." From this it would appear that congress at least intended that these latter clauses of the act should apply to the Indian Territory, for it is a place in the United States. Hence, if the shipments were from the Indian Territory to a foreign country, or from the Indian Territory through Canada, then to a place in the United States, the act would undoubtedly cover the shipments. These clauses in the act, taken in connection with the words "or territory of the United States," evidently determine the intention of congress, and show its intention to make the interstate commerce law apply to any shipment from any place in the United States to any other place in a different jurisdiction. In other words, it is to apply to all shipments which are not

wholly made within the bounds of any state in the Union. The sole object of inserting such a clause as this in the interstate commerce act was for the purpose of making that act conform to the constitution of the United States, which confers upon congress the right to regulate commerce among the states. Hence the object of congress in making these provisions was not to indicate so much where the law should be in force as to point out where it would not be in force, namely, from one point to another point within any state of the Union. The words of limitation were required by the constitution, and we must assume that congress intended to limit the act only in so far as the constitution required it should be limited. It was clearly the intention of congress to make the interstate commerce law apply to shipments to and from the Indian Territory, the same as to shipments in other localities in the United States. Any other construction would impute to congress either ignorance of the meaning of the language which was employed, or a willful disregard of the rights of shippers, and to others residing in the Indian Territory, and a discrimination as to all shipments to or from the Indian Territory. We cannot indulge either of these imputations. The language is free from doubt, taken in connection with the other provisions of the act and the object for which it was enacted. The interstate commerce act took effect in the Indian Territory at the same time it took effect elsewhere in the United States, and does not depend for its validity in this territory on the act of May 2, 1890, which put in force certain acts of congress in the Indian Territory. It is in force here by its own terms, and this court will recognize its validity as fully as it is recognized in the states and other territories of the Union. The rate filed with the interstate commission applicable to shipments from Cale, Indian Territory, to St. Louis, Mo., on hay, was 25 cents per hundredweight,—20,000 pounds minimum for each car. That was the rate charged by the company's agent at St. Louis, and paid by the consignee.

*Interstate Commerce law applies to Indian Territory.*

That was the legal rate, and, if any other rate had been given or accepted, such rate would have been illegal and void, and not binding upon either of the parties to the contract.

The authorities all agree that those contracts are illegal which rest upon a consideration that is fraudulent, against morality, or against the principles of sound public policy, or in contravention of the provisions of some statute. 2 Beach, Mod. Cont. § 1415, and note citing Goodrich vs Tenney, 144 Ill. 422, 33 N. E. 44; 2 Kent, Comm. 466. "A court of law will not lend its aid to enforce the performance of a contract which appears to have been entered into by both the contracting parties for the express purpose of carrying into effect that which the law of the land forbids." 2 Beach, Mod. Cont. § 1433; Broom, Leg. Max. 732. "A contract which violates the provisions of a public statute is contrary to public policy, and void; and it must be illegal, although not in contravention of the specific directions of the statute, if it be opposed to the general policy and intent of the statutory law." 2 Beach, Mod. Cont. § 1441, and cases there cited. "A contract which is void for want of power to make it under express statutory or constitutional provisions cannot be given validity in any way by a court of equity. The courts, in the administration of justice, will not enforce a contract in violation of law, or permit a plaintiff to recover upon a transaction against public policy, even if the invalidity of the contract or transaction be not specially pleaded." 2 Beach, Mod. Cont. § 1443; Hedges vs Dixon Co., 150 U. S. 182, 14 Sup. Ct. 71; Oscanyan vs Arms Co., 103 U. S. 261, and cases cited. "In an action for breach of a contract providing for the erection of a building by defendant for plaintiff in a manner prohibited by city ordinance, it was held that the contract was void, and although the parties were ignorant that it was in contravention of law, that the court would dismiss the action as soon as its illegality appeared on

the trial. Whatever tends to interfere with the beneficial operation of the law is unlawful, as against the policy of law. Whatever tends to obstruct duty by defeating the letter or spirit of the law is also unlawful; and the courts will not enforce an agreement or contract for the benefit of one through whose direction or advantage the law is violated or public policy contravened. The law attempts to close the door to temptations by refusing such parties recognition in the courts. No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If, from the plaintiff's own statement or otherwise, the cause of action appears to arise ex turpi causa, or from the transgression of a positive law of this country, then the court says he has no right to relief. It is upon that ground the court goes; not for the sake of the defendant, but because it will not lend its aid to such a plaintiff." 2 Beach, Mod. Cont. § 1443, and numerous cases there cited. In Myers vs Meinrath, 101 Mass. 366, the opinion of the court is applicable to the case at bar. In that case, Wells, J., said: "In the case cited, the action was for a chattel sold and delivered in exchange for another chattel on the Lord's day, which the defendant retained, notwithstanding the return by the plaintiff of the chattel for which it was exchanged, and his demand for a corresponding return by the defendant. It was held that the plaintiff could not recover, and the reasons for the decision were as follows: That contracts made on the Lord's day are illegal, that no action based upon such a contract can be maintained in a court of law or equity, either to enforce its obligations, or to secure its fruits, in favor of either party, are propositions settled beyond controversy. But such contracts are not altogether inoperative. They may be executed by the parties, and then the same principle of public policy which leads courts to refuse to act, when called upon to enforce them, will prevent the court from acting to relieve either party from the consequences of the illegal transaction. They may give effect to the executed illegal contract. The

·purpose of the law, however, is not to give validity to the transaction, but to deprive the parties of all right to have either enforcement of or relief from their illegal contract. In such cases the defense of illegality prevails, not as a protection to the defendant, but as a disability in the plaintiff. Upon this principle, possession acquired from an illegal transaction, or by a contract fully executed, will often avail the party holding it as a sufficient title. Neither party is allowed to impeach its validity by asserting the illegality of his own act. The transaction takes effect from the disability of the parties to assert any right to the contrary. The court does not give it effect, but simply refuses its aid to undo what the parties have already done."

Entertaining this view of the case at bar, we are of opinion that the court below erred in refusing the instructions asked by the appellant, and also erred in giving the instruction which was submitted to the jury on the trial of the case. The appellee cannot recover upon a contract which was forbidden by law, and was contrary to public policy, even if such contract had been entered into as contended by appellee's counsel. The judgment of the court below is reversed, and the case dismissed.

CLAYTON, J., concurs. KILGORE, J., concurs in part.