## FRIES–BRESLIN CO. v. BERGEN et al.

(Circuit Court, E. D. Pennsylvania. March 4, 1909.)

No. 314.

1. COURTS (§ 354*)—FEDERAL COURTS—CONFORMITY TO STATE PRACTICE.

The Pennsylvania practice act of April 22, 1905 (P. L. 286), provides that "whenever upon the trial of any issue a point requesting binding instructions has been reserved or declined the party presenting the point may * * * move the court to have all the evidence taken upon the trial duly certified and filed so as to become part of the record and for judgment non obstante veredicto upon the whole record; whereupon it shall be the duty of the court, if it does not grant a new trial to so certify the evidence and to enter such judgment as should have been entered upon that evidence." As construed by the Supreme Court of the state, such statute does not infringe upon the province of. the jury, but merely gives the court the same power after verdict that it had before to direct a verdict for either party upon the whole evidence. *Held*, that such practice was adaptable to the federal courts, and one which the Circuit Courts within the state were required to follow by Rev. St. § 914 (U. S. Comp. St. 1901, p. 684).

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 354.*

State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

2. INSURANCE (§ 103*)—AGENTS—LIABILITIES TO PRINCIPAL—ACTION FOR NEGLIGENCE.

Plaintiff, a manufacturing company, employed defendants, who were insurance brokers, to secure good insurance on its property at the best rates they could get, and they acted under such employment for several years. While so employed the president of plaintiff called on defendants and stated that the company. had given a mortgage on its "place" or "property" or "entire plant," and he desired some of the policies to deliver to the mortgagee as collateral. They were taken to the mortgagee's attorney, who accepted the same, and they were duly transferred. Later the president again told defendants that the company had made another mortgage of the "same kind." The policies contained a provision that they should be void if the subject of insurance was personal property and it should be or become incumbered by a chattel mortgage. *Held*, that there was nothing in plaintiff's communication which advised defendants that the mortgages covered personalty so as to affect the validity of the policies, especially in view of the fact that they were accepted without objection by the mortgagee's attorney, nor were defendants required to examine the records, and that they were not chargeable with negligence in permitting the policies to stand or in renewing the same when they expired.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 103.*]

On Motions for Judgment Non Obstante Veredicto and for a New Trial.

Graham C. Woodward and Roger Foster, for plaintiff.

Frank R. Shattuck and Alex. Simpson, Jr., for defendants.

HOLLAND, District Judge. The Fries-Breslin Company brings this suit against the defendants to recover the sum of $110,723.92, together with interest from the 4th day of October, 1904, because of the alleged negligent performance of their duties as the plaintiff's insurance agents or brokers in placing insurance upon plaintiff's property.

At the close of the trial, the defendants requested the court to charge

the jury that "the verdict must be for the defendants." This was refused by the court, and in due time the defendants filed the following motions:

"And now, January 4, 1909, defendants, upon the trial of the above case, having presented a point requesting binding instructions in their favor, which point was refused by the trial judge, now move the court to have all the evidence taken upon the trial duly certified and filed so as to become a part of the record, and for judgment non obstante veredicto upon the whole record."

This motion accords with the requirements of the Pennsylvania practice act of April 22, 1905 (P. L. 286), which provides:

"That whenever, upon the trial of any issue, a point requesting binding instructions has been reserved or declined, the party presenting the point may, within the time prescribed for moving for a new trial, or within such other or further time as the court shall allow, move the court to have all the evidence taken upon the trial duly certified and filed so as to become part of the record, and for judgment non obstante veredicto upon the whole record; whereupon it shall be the duty of the court, if it does not grant a new trial, to so certify the evidence, and to enter such judgment as should have been entered upon that evidence, at the same time granting to the party against whom the decision is rendered an exception to the action of the court in that regard. From the judgment thus entered either party may appeal to the supreme or superior court, as in other cases, which shall review the action of the court below, and enter such judgment as shall be warranted by the evidence taken in that court."

This act has been before the appellate courts of the state of Pennsylvania and carefully examined by Chief Justice Mitchell, of the Supreme Court, and Judge Orlady, of the superior court. The former, on May 24, 1906, in the case of Dalmas v. Kemble, 215 Pa. 410, 64 Atl. 559, in construing the act, said:

"The act being so recent, it is important that it should be examined closely, and its proper construction settled. * * * This statute makes no radical innovation on the settled line of distinction between the powers of the court and the jury. It shows no intention to infringe, even if it could constitutionally do so, the province of the jury to pass upon the credibility of witnesses and the weight of the oral testimony. The court has long had authority to direct a verdict for defendant when it was of opinion that the plaintiff, even if all his evidence be believed, has failed to make out his case. But this had to be done offhand at the trial, and a mistake of the judge either way resulted in delay and expense. If he directed for defendant, but on more deliberate examination or consideration came to the view that there was some evidence for the jury to pass upon, a new trial was the only remedy; while, on the other hand, if he refused a binding direction, but later found that it should have been given, the same result followed, for after a question has been submitted to a jury and the fact found by them the power of the court to enter a contrary judgment on the ground that the evidence was insufficient is gone. * * * The authority to reserve questions of law for the consideration of the court in banc was first conferred by the act of March 1, 1825 (P. L. 41), upon the judges of the district court of Philadelphia, continued in the same court by the act of March 28, 1835 (P. L. 88), and extended to the courts of the commonwealth generally by the act of April 22, 1863 (P. L. 554), together with the power, also first conferred on the district court of Philadelphia by the act of March 11, 1836 (P. L. 76), to enter a compulsory nonsuit if the plaintiff's evidence is not sufficient to maintain his action.

"The act of 1905 is another step in the same direction. It broadens the power of the judge in this respect, that whereas heretofore the verdict was required to be for the plaintiff and the reservation to be of leave to enter judgment for the defendant non obstante, now what is reserved is a request for binding instructions to the jury, and may be for either plaintiff or defendant.

But though thus enlarged so as to include both parties, the power of the judge is the same as it was before. He is 'to enter such judgment as should have been entered upon that evidence,' or, in other words, to treat the motion for judgment as if it was a motion for binding directions at the trial, and to enter judgment as if such direction had been given and a verdict rendered in accordance. What the judge may do is still the same in substance, but the time when he may do it is enlarged so as to allow deliberate review and consideration of the facts and the law upon the whole evidence. If upon such consideration it shall appear that a binding direction for either party would have been proper at the close of the trial, the court may enter judgment later with the same effect. But, on the other hand, if it should appear that there was conflict of evidence on a material fact, or any reason why there could not have been a binding direction, then there can be no judgment against the verdict now."

And Judge Orlady, in Ackley v. Bradford Township, 32 Pa. Super. Ct. 487, following the view of the Chief Justice as to the effect of the enactment, lays down the further rule that in passing upon the question, at the close of the trial, whether there was a conflict of evidence on a material fact, "the plaintiff's right to recover depended upon not only his own testimony, but the inferences to be drawn from the facts and circumstances adduced by other witnesses"; that is, all the witnesses, whether called by the plaintiff or defendant.

From Chief Justice Mitchell's clear and careful definition of the scope of the act, we see that while heretofore, at the trial of a case in the Pennsylvania state courts on reserved questions of law for the consideration of the court in banc, it was required that the verdict should be for the plaintiff, and the reservation to be of leave to enter judgment for the defendant non obstante veredicto, that now this power of the judge is enlarged by the act of 1905 by reserving a request for binding instructions to the jury, and may be for either plaintiff or defendant, but his action is of the same kind; though it may be exercised for either party, the power is the same.

A motion to enter a compulsory nonsuit under the act of March 11, 1875, P. L. 6 (13th Ed.) Purdon, 3320, supplying the provisions of the act of March 11, 1836 (P. L. 76), was required to be made by defendant and acted upon by the presiding judge at the close of the plaintiff's evidence, and was in effect a demurrer to the sufficiency of the evidence to maintain the action.

On this motion, it was necessary for the judge to act at once, and it was extremely difficult to accurately recall all the evidence and the inferences arising therefrom in favor of the plaintiff's case, especially when it was of a circumstantial nature and voluminous. The objection to this practice is its failure to afford the judge time for proper deliberation and examination as to the plaintiff's evidence in support of the matters at issue. Now, if there be any doubt about defendant's right to a nonsuit under the old practice, the court can overrule the motion, if one be made, and upon a motion for binding instructions under the act of 1905, at the close of the trial, what the judge may do is still the same in substance, but the time when he may do it is enlarged so as to allow deliberate review and consideration of the facts and the law upon the whole evidence, and he may enter the judgment for either plaintiff or defendant.

It is urged by plaintiff that the act is not adaptable to the federal court practice, and cannot be followed. The highest tribunals in the

state have held the act is no attempt to infringe upon the province of a jury to pass upon the credibility of the witnesses and the weight of the oral testimony, but simply broadens the power of the judge in the matter of practice in the state in entering judgment non obstante on reserved questions of law, and the only difference between a motion to order a nonsuit of the plaintiff and a motion to direct a verdict for the defendant is one "rather of matter of form than of substance." Oscanyan v. Arms Co., 103 U. S. 264, 26 L. Ed. 539; Central Transp. Co. v. Pullman Co., 139 U. S. 39, 11 Sup. Ct 478, 35 L. Ed. 55.

In the latter case, to wit, Central Transp. Co. v. Pullman Co., the court held that the Pennsylvania act of March 11, 1875, authorizing "the presiding judge at the trial to order a judgment of nonsuit to be entered if in his opinion the plaintiff shall have given no such evidence as in law is sufficient to maintain the action," is a matter of practice required to be followed under Rev. St. § 914 (U. S. Comp. St. 1901, p. 684), in the Circuit Court of the United States held within the state. Under the state act the motion for a nonsuit is made at the close of the plaintiff's evidence, and must be then refused or allowed by the presiding judge on the plaintiff's evidence alone; but a motion to direct a verdict is made at the close of the case after both plaintiff and defendant have produced the evidence on both sides, and the judge must then refuse or allow the motion upon the whole evidence; and the act of 1905 changes the time when the judge must finally act on the motion for judgment on the whole evidence by enabling him to do so after the verdict, and this is a matter of practice or procedure which the federal courts are required to follow by Rev. St. § 914. Whether a defendant in an action of law, by a demurrer to the evidence, or by a motion to order a nonsuit, or by a motion to direct a verdict for the defendant, may present the defense that the plaintiff upon his own case shows no cause of action, is a question of "practice, pleadings and forms and modes of proceeding," as to which the courts of the United States are now required by act of Congress of June 1, 1872, c. 255, § 5, 17 Stat. 197, re-enacted in section 914, Rev. St. (U. S. Comp. St. 1901, p. 684), to conform "as near as may be" to those existing in the courts of the state within which the trial is had. Central Transp. Co. v. Pullman Co., supra. The enlargement of the power of the judge so that at a different time he may pass either upon the defense that the plaintiff upon the whole evidence has not made a case, or that upon the whole record the defendant has produced no evidence in support of his defense, makes the enactment no less a question of "practice, pleadings and forms and modes of proceeding" which the federal courts are required to follow, and the objection that the act cannot be followed because it directs that an appeal shall be taken to the "supreme or superior court," which are state courts, cannot be seriously regarded. Section 914 requires the federal court to follow, "as near as may be," so that, where in state practice the act authorized an appeal to the state supreme or superior court, in federal practice the appeal would be to the Circuit Court of Appeals. This seemed to be the view of Justice Gray in Central Transp. Co. v. Pullman Co., supra. While the question was not raised there, the act of March 11, 1875, contained the same provision for a writ of error to the Supreme Court.

The qualifying clause, "as near as may be," must be construed as allowing the necessary variations from state methods, growing out of the different organization of courts and other similar matters. Lewis v. Gould, 13 Blatchf. 216, 15 Fed. Cas. 483. It is a "practice" or "mode of proceeding" well fitted for expediting the work of jury trials in the Circuit Court, and section 914, Rev. St. requires us to follow it.

We shall, therefore, proceed to the consideration of the defendants' motion for judgment in their favor notwithstanding the verdict. It is founded upon two grounds: (a) There was no evidence that any of the insurance companies could have paid more than they did in fact pay; (b) under the facts testified to there was no proof of negligence. The latter will be first considered.

It must be remembered, in the consideration of this motion upon the ground of "no proof of negligence," that, "where there is a conflict of evidence on a material fact or any reason why there could not have been a binding direction," judgment cannot be entered. Delmas v. Kemble, supra. In the examination of the question as to whether there is a conflict of evidence on a material fact, it will be necessary to ascertain whether or not the whole evidence tends to establish any negligence on the part of the defendants as insurance agents or brokers of the plaintiff. This is the material fact in the case, and if there be any conflict of evidence on that pivotal point, then the verdict of the jury must stand in so far as this objection goes.

In order that it may clearly appear what the issue is, as set forth by the plaintiff in its declaration, I copy the following:

"The defendants were insurance agents or brokers for the plaintiff from the year 1893 to and including the year 1904, and as such brokers were employed by the plaintiff to procure policies of insurance against loss by fire upon its property, to wit, its mill or factory and other buildings, its machinery, fixtures, and stable contents, its merchandise, designs, and supplies, in the sum of three hundred thousand dollars ($300,000), and to keep the same at all times so insured by good and valid insurance policies, by the terms of which in case of loss by fire the amount of such loss would be payable to the plaintiff, and as such agents or brokers the defendants entered upon their duties and essayed to keep the property aforesaid insured as aforesaid.

"The plaintiff avers that at the time of such employment it informed the defendants that the said property was incumbered by a mortgage which included in its lien all the real and personal property of the plaintiff, and that subsequently, when a second mortgage was negotiated, it informed the defendants that the said property was incumbered by two mortgages which included in their lien all the real and personal property of the plaintiff, to wit, one mortgage to Wilson Fitzgerald in the sum of $50,000, and one to John J. Burleigh in the sum of $60,000, and the defendants well knew that the said mortgages were outstanding and valid liens against all the real and personal property of the plaintiff company, and were chattel mortgages as well as mortgages of the realty. It then and there became and was the duty of the defendants to procure policies of assurance against loss by fire on the said mill or factory and other buildings, machinery, fixtures, stable contents, merchandise, designs, and supplies of the plaintiff in the sum of $300,000 by good and valid insurance policies, by the terms of which, in case of loss by fire, the said loss would be payable to plaintiff notwithstanding the existence of the two chattel mortgages hereinabove mentioned, policies of which character were issued by good and responsible insurance companies, and could and should have been obtained by the defendants. Nevertheless the plaintiff avers that the defendants carelessly and negligently did procure insurance policies, a schedule of those which were outstanding at the time of the fire being annexed hereto, marked 'Exhibit A' and made part hereof, under and by the terms of which it was pro-

vided that said policies should each and all be void if the subject of the insurance be personal property and be or become incumbered by a chattel mortgage, and which said policies were wholly useless and did not by their terms insure the plaintiff against any loss by fire whatever, but were all wholly void and of no effect, as the defendants then and there well knew. The plaintiff, moreover, avers that it had no knowledge of the terms and conditions of the said insurance policies, but acted on the sole advice of the said defendants, who were acting as its skilled insurance agents or brokers."

It will be noted that the claim of the plaintiff is that the defendants were negligent in that (1) they had been informed by the plaintiff that two mortgages were placed upon "all the real and personal property of the plaintiff company, and were chattel mortgages as well as mortgages of the realty," and notwithstanding their instructions and legal obligation, under the circumstances of this case, to secure good and valid insurance, the defendants procured policies containing a clause making the insurance void in case of the existence of chattel mortgages; and (2) that these chattel mortgages were placed upon the property by the plaintiff company, which "acted on the sole advice of the said defendants, who were acting as its skilled insurance agents or brokers," and without any knowledge of the existence of the terms and conditions of the insurance policies which were in force at the time of the creation of the mortgages, and which were the same in terms as those in force at the time of the loss caused by the fire, to wit, October 3, 1904. Or, to state the whole issue in another form: The plaintiff claims that its agent (the defendants) permitted it (the plaintiff), acting under their advice, to execute a chattel mortgage on its personal property in violation of a provision in the then existing policies, and that, further, after being informed by the plaintiff of the existence of the chattel mortgages, the policies were renewed by the defendants as agents of the plaintiff, containing the same clause against chattel mortgages, making all the policies void. It may be conceded that if the chattel mortgages were placed upon the property by the advice of the defendants, who were afterward informed of their existence by plaintiff, and they (the defendants), in face of this knowledge, secured policies containing the prohibition against chattel mortgages resulting in avoiding all the insurance, the defendants would be liable. Was there, then, any evidence offered in support of this alleged negligence? The evidence of the defendants' actions in securing the insurance and their information as to the existence of the chattel mortgages at the time is contained in the testimony of John M. Carroll president of plaintiff company, and the two defendants. The former testified as follows:

"Q. And did you employ them on behalf of that corporation? A. Yes, sir. Q. The Fries-Breslin Company? A. Yes, sir. Q. To do what? A. To secure insurance for the company. Q. What did you say to them on the subject? A. I came to them and told them that I wanted them to get the insurance; or, rather, they came to me to get it. Q. They came to you to solicit the business? A. Yes, sir. Q. And they persuaded you to allow them to take charge— (Objected to as leading). Q. Did you give them charge of it? A. Yes, sir. Q. What did you tell them about the insurance you wished? A. To get us good insurance, and at the best rate they could get. Q. What, if anything, did you say to the defendants, or either of them, as regards these chattel mortgages at the time of that increase? A. I came and told them we had placed a mortgage on the place. I came and told them at their office that we had placed

a mortgage of $50,000 on the entire plant. A. What, if anything, did you say after the second mortgage was made? A. Nothing whatever. Q. To either of those gentlemen? A. Nothing, only told them we had placed another mortgage the same as the first one, but that the mortgagee did not want any policy. They said that was all right."

Cross-examination:

"Q. You told us of a time when you spoke to Mr. Bergan, or Mr. Snyder, or both of them, about this Fitzgerald mortgage. You remember telling that, do you not? A. I do, well. Q. At that time you came and got these policies, did you not? A. No, sir, I did not. I came to get them, but did not get them. Q. Did not you get those policies, and take them over to the attorney for Mr. Fitzgerald? A. Mr. Bergan and Snyder sent them to them. Q. Do you mean to say it was not with your consent a certain number of them were set apart as collateral for his mortgage and retained by him? A. It was with my consent. Q. It was with your consent? A. Yes, sir. Q. Who brought the balance of the policies back to Bergan and Snyder? A. I do not know. Are you speaking now before the fire or after?"

John A. Snyder, one of the defendants, testified on this point as follows:

"Q. You are one of the defendants in this case? A. Yes, sir. Q. And you were the brokers who placed directly or indirectly insurance upon the Fries-Breslin property? A. Yes, sir. Q. What knowledge had you of the character of the Wilson Fitzgerald mortgage which has been here referred to? A. The statement of Mr. Carroll that he placed a mortgage of $50,000 on the property at Camden. Q. Did he state what was the character of the mortgage? A. No, sir. Q. When did you first learn that the Wilson Fitzgerald mortgage covered other than the buildings and machinery in the buildings? A. At a meeting of the adjusters after the fire. Q. And from whom did you learn that? A. I cannot say. One of the adjusters. Q. You know how long after the fire it was? A. It was at the first meeting of the adjusters, a week or two after the fire. Q. When did you first learn of the existence of the Burleigh mortgage? A. After the fire. Q. Who informed you of it after the fire? A. It was simply hearsay. Q. When the Fitzgerald mortgage was first created and certain policies were made payable to Fitzgerald, who had those policies of insurance at that time? A. We had. Q. What was done with them? A. Mr. Carroll came to our office and stated that a mortgage had been placed on the property, and he wanted the policies to take over to the attorney's office representing the mortgagee. Q. Did he get them? A. He got them. Q. And took them over himself, did he? A. Yes, sir. Q. How many policies did he take—part of them, or all of them? A. All of them. Q. Did any of them afterwards come back to you? A. Yes, sir. Q. Who brought them back? A. Mr. Carroll. Q. Those policies, what became of them after that? A. A number of them were made loss if any payable according to an indorsement furnished to us by Mr. Carroll, and the others were kept by us, and they were sent to Mr. Wilson Fitzgerald or his representative. Q. The ones that had the indorsement, loss, if any, payable to Wilson Fitzgerald, were sent to him or his attorney? A. Yes, sir. Q. By whom? A. By us. Q. And the others, that were brought back by Mr. Carroll, that did not have that indorsement on, what was done with them? A. They were kept by us. Q. When policies, which were thus made payable to Wilson Fitzgerald, the mortgagee, in the way that has been stated, were renewed, what would be done with those renewed policies? A. We sent them to Mr. Fitzgerald, or his nephew, I believe."

And the testimony of the other defendant, William Bergan, was the following:

"Q. When did you first learn of the existence of the Wilson Fitzgerald mortgage? A. About the time, or shortly after it was created, or spoken of. I do not know how long ago that was, but about the time. Q. From whom did you learn it? A. I think it was through Mr. Carroll, who told us that such a mortgage was created, and it was necessary to have the policies so indorsed

Through Mr. Carroll. Q. Did he say what that mortgage covered? A. I cannot positively say. I presumed at the time it was on the buildings and machinery. Q. Did you know of the sending of the policies over to Mr. Fitzgerald, or his counsel, for the purpose of having the indorsement of the loss payable on them? A. Yes, sir, Mr. Snyder attended to that. Q. Were you present when Mr. Carroll called in regard to that? A. Yes. sir. Q. Who took the policies away? A. Mr. Carroll. Q. Were you present when they were brought back—the ones that were not kept by Mr. Fitzgerald, I mean? Were you present when they were brought back? A. I cannot say. Q. Do you have personal knowledge as to who brought them back? A. Mr. Carroll."

These policies do not prohibit the usual real estate mortgage; they only forbid a chattel mortgage. John M. Carroll had informed them that he had placed a mortgage on the "place" or on the "entire plant" or on "the property" at Camden. Contrary to the allegation contained in the statement that plaintiff was acting "on the sole advice of the defendants" (in support of which averment there is no evidence whatever), it appears from the testimony of the three witnesses above set out that the plaintiff created the mortgage and then gave the defendants the information that it placed a mortgage on the "place" or on the "entire plant" or on the "property" at Camden. The agents were not present at the creation of the mortgage, and knew nothing of it until Carroll called on them to get the policies to have them delivered to the mortgagee as collateral security, and at that time he informed them the first mortgage had been executed. A number of these policies were subsequently sent to the attorney of Wilson Fitzgerald, and when returned Carroll requested defendants to indorse some of them. "Loss or damage if any on buildings and machinery under this policy shall be payable to Wilson Fitzgerald, mortgagee, as interest may appear," etc. The defendants retained those which were not so indorsed, and sent the indorsed policies to Fitzgerald's attorney. Subsequently, the defendants were informed by Carroll that a second mortgage, "same as the first," had been placed, and that the "mortgagee did not want any policies." Thus it will be seen that what Carroll told the defendants when he called for the policies, and what they could learn from the circumstances of their indorsement and acceptance as collateral by a mortgagee and his attorney, was the only information they had as to the existence and kind of mortgage, and it is urged this is sufficient to warrant the inference that the defendants were fully informed they were chattel mortgages within the prohibition of the policies, and, being so informed, it was their duty, when renewing these policies, to have obtained the permission of the insurance companies to continue the existence of the chattel mortgage.

As I now view the testimony of Carroll and the circumstances of his informing the defendants of the existence of the mortgages, they were warranted in concluding that a renewal of the policies, in the form theretofore secured, would be a compliance with their duty as agents under their instructions. Carroll did not call on them for information, or to know what he might do under the policies. He called to get the policies for his purpose, about which he had not consulted the defendants, and merely told them what he wanted to do with the policies; that is, he wanted them for collateral for a mortgage he had

placed on the plant, and the mortgagee and his attorney, who created the mortgage, accepted and had them so indorsed. To what other conclusion would insurance brokers—not lawyers—come than that nothing had been done by the plaintiff in the transaction contrary to the requirement of the policies? The policies permitted the execution of a mortgage, and the man who loaned $50,000, together with his attorney, took the policies as collateral security. All this was done without consulting the agent, and after the mortgage was created they were simply told that a mortgage had been executed on the "place," on the "entire plant," or on the "property," and this information was simply given for the purpose of requiring them to produce the policies as collateral, which they did, and found that they had been accepted by the mortgagee's lawyer. Could there be any other combination of facts and circumstances which would have more forcibly induced the defendants to believe that the plaintiff was acting well within his rights under the policies? They naturally would feel safe in renewing the insurance, in the same form, and to have them indorsed, as theretofore, as collateral for the Wilson Fitzgerald mortgage. The renewed policies were accepted by the mortgagee, thereby a second time indicating his confidence in the policies as collateral security for his mortgage, which subsequently turned out to be a chattel mortgage.

The most plaintiff can claim is that the words "place," "plant," and "property" have several meanings, and that the defendants might have learned the exact kind of mortgages placed upon the property if they had gone to the records in Camden and made an examination. But was it not rather the duty of the plaintiff to properly inform the defendants as to the nature of the mortgages it executed? It was no more the defendants' duty to go to Camden and examine the records as to the condition and kind of mortgages than it would have been their duty to go to the plant and examine minutely whether any one of the other numerous conditions had been violated, and, in view of the fact that subsequently the attorneys in the litigation differed as to whether the mortgages were chattel mortgages or not, it would appear that the defendants would have obtained very little useful information by an examination of the record of the mortgage. But they were not required to do so. What was done by the plaintiff in regard to the mortgages cannot be tortured into information that a chattel mortgage had been placed upon the property, and in the absence of such information, with the knowledge that the former policies of the same 'kind were accepted and approved as valid by the mortgagee and his attorney, they had a right to assume that the plaintiff was acting within his right in this regard. The defendants were not informed otherwise, and they proceeded with due diligence in law to secure "good insurance and at the best rate they could get." All these policies are standard policies, used by all first-class companies, insuring property in the states of New York, Pennsylvania, and New Jersey, and the clause against chattel mortgages appears in all of them. It follows, then, that as the defendants were not informed by the plaintiff of the existence of a chattel mortgage, or any other fact tending to invalidate the policies, they (the defendants) were

justified in assuming that the same condition as to the property existed at the time of the renewal, and that the acceptance of standard, policies in the renewal, of a similar kind, would be entirely proper. They were acting, in our judgment, in accordance with the requirements of faithful and careful brokers in thus renewing this insurance, unless, in law, they were required to go farther and inquire for themselves whether or not the insured had done anything which would make a renewal of the insurance, in the form as theretofore, invalid, and to post the insured as to the conditions in the policies, whether requested to do so or not. The duty of the agent is correctly stated in 22 Cyc. p. 1448:

"As between the insured and his own agent or broker authorized by him to procure insurance, there is the usual obligation on the part of the latter to carry out the instructions given him and faithfully discharge the trust imposed in him, and he may become liable in damages for breach of duty. If he is instructed to procure specific insurance and fails to do so, he is liable to his principal for the damage suffered by reason of the want of such insurance; and a general undertaking to keep the property of the principal insured will render the agent liable for negligence in not securing or renewing insurance on the property. In either case the liability of the agent with respect to a loss is that which would have fallen upon the company had the insurance been effected as contemplated; any negligence or wrongful act of the agent defeating in whole or in part the insurance which he is directed to secure or maintain will render him liable to his principal for resulting loss, and such agent is also liable if he places the insurance in companies not authorized by law to do business in the state, the policies being void on that account."

This summary of the law as to the responsibility of the broker to his principal, so far as it goes, is fully sustained by the cases cited, and they go no further than to require that the agent shall carry out the instructions given him and faithfully discharge the trust imposed in him, and, if he be instructed to procure specific insurance, he must do so, or, where there has been a general undertaking to keep the property of the principal insured, the agent will be held liable if he neglects to renew the insurance on the property. The defendants here had been the agents of the plaintiff since 1893, and had therefore assumed a general responsibility to keep the property of the principal insured by securing a renewal of the insurance from time to time; but there is nothing in the above statement of the law which would indicate that the agent was to do other than faithfully carry out the instructions given him, which if done in accordance therewith, in securing and renewing the insurance, he has done his whole duty, and if the insured leaves his agent in ignorance and fails to keep him properly informed as to the condition and use of the property and permits him to secure a renewal of insurance, which may be afterwards avoided by reason of some act of the insured, of which he fails to inform his agent, he cannot afterwards hold the agent responsible. Of course, if the agent fails to carry out the instructions given him by his principal in any particular, or if he secures insurance in companies which subsequently turn out to be insolvent, or if the agent be put in possession of the necessary information and yet negligently secures invalid policies, or if the agent, either voluntarily or upon request made by the insured, erroneously informs the insured of the conditions of the policies, he will be held in law to be negligent in the performance

of his duty as agent, and responsible for any loss that may result to the insured by reason of the invalidity of the insurance.

No case has been brought to the attention of the court in which the agent has been held responsible for a failure to collect on policies procured by the latter in obedience to instructions, but in all of them there was something more in order to make the agent liable—some wrongful act on his part. In Kaw Brick Co. v. Hogsett, 73 Mo. App. 432, the agent secured insurance in an insolvent company. In Baxter v. Jones, 6 Ontario Law R. 360, the agent undertook to have additional policies placed on the plaintiff's property, and to notify the companies already holding policies of this additional insurance, and failed to give the notice. In Landusky v. Bierne, 80 App. Div. (N. Y.) 272, 80 N. Y. Supp. 238, the agent was instructed to secure a "good policy in a very good company," enforceable in New York or Pennsylvania, which the agent failed to do. In Park v. Hamond, 4 Campbell, 344, there was a failure to follow instructions and secure insurance from Malaga and Gibraltar to Dublin, the agent having only secured it from Gibraltar to Dublin. He was held liable for his failure to cover the goods loaded at Malaga. In French v. Reed, 6 Bin. (Pa.) 308, the agent was to secure insurance from Philadelphia to Santiago and two ports on the island, and secured the insurance to one port only. In Milliken v. Woodward, 64 N. J. Law, 444, 45 Atl. 796, the agent informed of all the facts misstated the ownership, and was held liable. In Kroeger v. Pitcairn, 101 Pa. 311, 47 Am. Rep. 718, the broker was held liable where he erroneously told the insured that the conditions in the policies forbidding the keeping of kerosene oil applied only to more than one barrel. And so through all the cases where the question has arisen, the agent or broker has been held liable only where he has either omitted to follow out the instructions of his principal, or assumed to inform his principal, either voluntarily or by request, of the conditions in the policy, and misled the principal by giving him erroneous instructions.

The defendants had undertaken generally to keep the property of the plaintiff insured, and they had done so from 1893, the time when they had assumed this responsibility. Before the final renewal the principal had directed the defendants to secure "good insurance and at the very best rate they could get." No further or different directions were given them, and these were faithfully carried out. They were not informed of any facts or circumstances existing at the time of the final renewal which would require insurance containing different conditions than those contained in the policies preceding, but, upon the other hand, the actions of the president of the plaintiff company, the facts and circumstances surrounding the mortgage transaction, all tended, so far as that matter was concerned, to persuade the defendants to believe that nothing had been done to require a different form of policy, and they were therefore justified in acting as they did.

We conclude that the case was submitted to the jury on the erroneous statement of the duty of the agent to the principal, and that there was no evidence offered to establish the alleged negligence on

the part of the defendants. Judgment must therefore be entered in their favor. The order of the court, therefore, is that judgment be entered, on the defendants' motion, in their favor, notwithstanding the verdict.