## Oscanyan v. Arms Company.

1. Where it is shown by the opening statement of counsel for the plaintiff that the contract on which the suit is brought is void, as being either in violation of law or against public policy, the court may direct the jury to find a verdict for the defendant.
2. A court is, in the due administration of justice, bound to refuse its aid to enforce such a contract, although its invalidity be not specially pleaded.
3. A consul-general of a foreign government, residing in this country, entered into a contract, whereby, in consideration of a stipulated percentage, he agreed to use his influence in favor of a manufacturing company here with an agent of that government sent to examine and report in regard to the purchase of arms for it. By exerting his influence, sales of arms were made by the company to that government, and he brought suit to recover the percentage. *Held,* that, in a court of the United States, there can be no recovery on the contract.

ERROR to the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*Mr. Theodore W. Dwight* and *Mr. Richard O'Gorman* for the plaintiff in error.

*Mr. Edmund Randolph Robinson, contra.*

MR. JUSTICE FIELD delivered the opinion of the court.

This is an action to recover the sum of $136,000, alleged to be due to the plaintiff upon a contract with the defendant, as commissions on the sales of fire-arms to the Turkish government, effected through his influence. The defendant pleads the general issue. At the time the transactions occurred, out of which this action has arisen, the plaintiff was consul-general of the Ottoman government at the port of New York. The defendant is a corporation, created under the laws of Connecticut. The action was originally commenced in the Supreme Court of New York, and on motion of the defendant, was removed to the Circuit Court of the United States. When it was called for trial, and the jury was impanelled, one of the plaintiff's counsel, as preliminary to the introduction of testimony, stated to the court and jury the issues in the case, and the facts which they proposed to prove. From such statement it appeared that the sales for which commissions were claimed by the plaintiff were made whilst he was an officer of the Turkish government, and through the influence which he exerted upon its agent sent to this country to examine and report in regard to the purchase of arms. The particulars of the services rendered will be more fully mentioned hereafter. It is sufficient now to say that the defendant, considering that the facts which the plaintiff proposed to prove showed that the contract was void as being corrupt in itself and prohibited by morality and public policy, upon which no recovery could be had, moved the court to direct the jury to render a verdict in its favor. The court thereupon inquired of the plaintiff's counsel if they claimed or admitted that the statements which had been made were true, to which they replied in the affirmative. Argument was then had upon the motion, after which the court directed the jury to find a verdict for the defendant, which was accord-

ingly done.  Judgment being entered upon it, the case was brought to this court for review.  The reversal of the judgment is sought for alleged errors of the court below in three particulars: —

1st, In directing a verdict for the defendant upon the opening statement of the plaintiff's counsel;

2d, In holding that the question of the illegality of the contract could be considered in the case, the same not having been specially pleaded; and,

3d, In adjudging that the contract set forth in the opening statement was illegal and void.

Each of these grounds will be carefully examined.

1. Several reasons are presented against the power of the court to direct a verdict upon the statement of the facts which the plaintiff proposed to prove, that might be more properly urged against its exercise in particular cases.  The power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced.  The question in either case must be whether the facts upon which it is called to instruct the jury be clearly established.  If a doubt exists as to the statement of counsel, the court will withhold its directions, as where the evidence is conflicting, and leave the matter to the determination of the jury.

In the trial of a cause the admissions of counsel, as to matters to be proved, are constantly received and acted upon.  They may dispense with proof of facts for which witnesses would otherwise be called.  They may limit the demand made or the set-off claimed.  Indeed, any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure equally as if established by the clearest proof.  And if in the progress of a trial, either by such admission or proof, a fact is developed which must necessarily put an end to the action, the court may, upon its own motion, or that of counsel, act upon it and close the case.  If, on a trial for a homicide, to take an illustration suggested by counsel, it should appear from the opening statement that the accused had been pardoned for the offence charged, it would be a waste of time to listen to the evidence of his original criminality; for if estab-

lished he would still be entitled to his discharge by force of the pardon. So in a civil action, if it should appear from the opening statement that it is brought to obtain compensation for acts which the law denounces as corrupt and immoral, or declares to be criminal, such as attempts to bribe a public officer, or to evade the revenue laws, or to embezzle the public funds, the court would not hesitate to close the case without delay. Of course, in all such proceedings nothing should be taken, without full consideration, against the party making the statement or admission. He should be allowed to explain and qualify it, so far as the truth will permit; but if, with such explanation and qualification, it should clearly appear that there could be no recovery, the court should not hesitate to so declare and give such direction as will dispose of the action.

Here there were no unguarded expressions used, nor any ambiguous statements made. The opening counsel was fully apprised of all the facts out of which his client's claim originated, and seldom was a case opened with greater fulness of detail. He dwelt upon and reiterated the statement of the fact which constituted the ground of the court's action in directing a verdict for the defendant, namely, that it was Oscanyan's influence alone which controlled the agent of the Turkish government; and for the use of that influence the defendant had agreed to give the compensation demanded, — that is to say, that whilst an officer of the Turkish government the plaintiff had stipulated for a commission on contracts obtained from it through his personal influence over its agent. Had the case been pending in a court of some of the States, or in an English court, a nonsuit would have been ordered, if the facts stated had been deemed fatal to the action. Involuntary nonsuits not being allowed in the Federal courts, the course adopted was the proper proceeding. The difference in the two modes is rather a matter of form than of substance, except in the case of a nonsuit a new action may be brought, whereas in the case of a verdict the action is ended, unless a new trial be granted either upon motion or upon appeal.

The language of this court in numerous cases is in accordance with these views, though used with reference to directing a verdict after evidence is received. But, as already stated,

it cannot make any difference as to the power of the court, whether the facts be developed by the evidence or be admitted by counsel. In *Merchants' Bank* v. *State Bank* it appeared, that, upon the evidence on behalf of the plaintiff being closed the defendant's counsel moved the court below to instruct the jury that it was not sufficient to enable them to find a verdict for the plaintiff. The instruction was given, and the jury found for the defendant. The case being brought here on writ of error, this court said, speaking through Mr. Justice Swayne: "According to the settled practice in the courts of the United States, it was proper to give the instruction, if it were clear the plaintiff could not recover. It would have been idle to proceed further when such must be the inevitable result. The practice is a wise one; it saves time and costs; it gives the certainty of applied science to the results of judicial investigation; it draws clearly the line which separates the provinces of the judge and jury, and fixes where it belongs the responsibility which should be assumed by the court." 10 Wall. 604, 637.

In *Pleasants* v. *Fant*, this court, speaking of a case where the evidence was insufficient to justify a verdict, and where it would be the duty of the court below to set it aside and grant a new trial, said, speaking through Mr. Justice Miller: "Must the court go through the idle ceremony in such a case of submitting to the jury the testimony on which plaintiff relies, when it is clear to the judicial mind that if the jury should find a verdict in favor of plaintiff, that verdict would be set aside and a new trial had? Such a proposition is absurd, and accordingly we hold the true principle to be that if the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury." 22 Wall. 116, 122.

In *Railroad Company* v. *Fraloff* it was claimed by the company that the court below erred in not giving a peremptory instruction for a verdict in its favor. But this court, whilst holding the position untenable, said, speaking through Mr. Justice Harlan: "Had there been no serious controversy about the facts, and had the law, upon the undisputed evi dence, precluded any recovery whatever against the com

pany, such an instruction would have been proper." 100 U. S. 24, 26.

Indeed, there can be, at this day, no serious doubt that the court may at any time direct a verdict when the facts are undisputed, and that the jury should follow such direction. The maxim that questions of fact are to be submitted to the jury, and not to be determined by the court, is not violated by this proceeding any more than by a nonsuit in a State court where the plaintiff fails to make out his case. The intervention of the jury is required only where some question of fact is controverted.

Our conclusion, therefore, is that the first position of the plaintiff is not well taken.

The suggestion in the argument, that the counsel who made the opening had been called into the case only two days before the trial, and was not, therefore, fully prepared to open it, does not merit consideration. In the first place, the record does not show that any application was made to the court for a postponement of the trial on that ground; in the second place, two days ought to have been ample time for the counsel to acquaint himself with the essential facts of the case; and in the third place, no new fact is even now mentioned that would have materially changed his statement.

2. The position of the plaintiff that the illegality of the contract in suit cannot be noticed, because not affirmatively pleaded, does not strike us as having much weight. We should hardly deem it worthy of serious consideration had it not been earnestly pressed upon our attention by learned counsel. The theory upon which the action proceeds is that the plaintiff has a contract, valid in law, for certain services. Whatever shows the invalidity of the contract, shows that in fact no such contract as alleged ever existed. The general denial under the Code of Procedure of New York, or the general issue at common law, is, therefore, sustained by proof of the invalidity of the transaction which is designated in the complaint or declaration as a contract.

Whilst, however, at the common law, under the general issue in assumpsit, it was always admissible to give in evidence any matter which showed that the plaintiff never had a valid cause

of action, in practice many other matters were allowed under that plea, such as went to the discharge of the original cause of action, and showed that none subsisted at the commencement of the suit, — such as payment, release, accord and satisfaction, and a former recovery, and excuses for non-performance of the contract; and also that it had become impossible or illegal to perform it. 1 Chitty, Pleading, 493; *Craig* v. *The State of Missouri*, 4 Pet. 410–426; *Edson* v. *Weston*, 7 Cow. (N. Y.) 278; *Young* v. *Rummell*, 2 Hill (N. Y.), 478. It followed that there were many surprises at the trial by defences which the plaintiff was not prepared to meet. The English courts, under the authority of an act of Parliament passed in the reign of William IV., adopted rules which, to some extent, corrected the evils arising from this practice of allowing defences under the general issue which did not go directly to the validity of the original cause of action. And the Code of Procedure of New York did away entirely with the practice in that State, and required parties relying upon anything which, admitting the original existence of the cause of action, went to show its discharge, — such as a release or payment, or other matter, — to plead it specially, in order that the plaintiff might be apprised of the grounds of defence to the action. We do not understand that the code makes any other change in the matters admissible under the general denial.

But if we are mistaken in this view of the system of procedure adopted in New York, and of the defences admissible according to it under a general denial in an action upon a contract, our conclusion would not be changed in the present case. Here the action is upon a contract which, according to the view of the judge who tried the case, was a corrupt one, forbidden by morality and public policy. We shall hereafter examine into the correctness of this view. Assuming for the present that it was a sound one, the objection to a recovery could not be obviated or waived by any system of pleading, or even by the express stipulation of the parties. It was one which the court itself was bound to raise in the interest of the due administration of justice. The court will not listen to claims founded upon services rendered in violation of common decency, public morality, or the law. History furnishes instances of robbery,

arson, and other crimes committed for hire. If, after receiving a pardon, or suffering the punishment imposed upon him; the culprit should sue the instigator of the crime for the promised reward, — if we may suppose that audacity could go so far, — the court would not hesitate a moment in dismissing his case and sending him from its presence, whatever might be the character of the defence. It would not be restrained by defects of pleading, nor, indeed, could it be by the defendant's waiver, if we may suppose that in such a matter it would be offered. What is so obvious in a case of such aggravated criminality as the one supposed, is equally true in all cases where the services for which compensation is claimed are forbidden by law, or condemned by public decency or morality.

This doctrine was applied in *Coppell* v. *Hall*, reported in 7th Wallace. In that case Coppell was the acting British consul in New Orleans, and during the late civil war entered into a contract with one Hall, by which the latter agreed to furnish him with sundry bales of cotton, which he was to cause to be protected from seizure by our forces and transported to New Orleans, and there disposed of to the best advantage, he to receive one-third of the profits for his compensation. For breach of this contract he sued Hall, who set up that the contract was against public policy and void, and also a reconventional demand or counterclaim for damages for a breach of the contract by Coppell. On the trial, the court below, among other things, instructed the jury that if the contract was illegal, the illegality had been waived by the reconventional demand of the defendant; but this court said, speaking through Mr. Justice Swayne, that the instruction " was founded upon a misconception of the law. In such cases," he added, " there can be no waiver. The defence is allowed, not for the sake of the defendant, but of the law itself. The principle is indispensable to the purity of its administration. It will not enforce what it has forbidden and denounced. The maxim, *ex dolo malo non oritur actio*, is limited by no such qualification. The proposition to the contrary strikes us as hardly worthy of serious refutation. Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize

its effect.    A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons.    Wherever the contamination reaches it destroys.    The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation."    See also *Holman* v. *Johnson*, 1 Cowp. 341.

Approving of the doctrine so well expressed in this citation, our conclusion is, that the second position of the plaintiff is not well taken.

3. We are brought, then, to the consideration of the contract upon which the action is founded.    This is given in the opening statement of the plaintiff, with full particulars of the services rendered.    We need only repeat its essential portions.    As already mentioned, he was, at the time, consul-general of the Ottoman government at the port of New York.    For many years previously to 1869 he had resided in the United States, and was familiar with our language.    In that year the Turkish government sent Rustem Bey, an officer of high rank in its service, to the United States to examine and report in regard to the purchase of arms and machinery for its use.    He was a friend of the plaintiff ; had known him many years, and their relations were intimate.    On his arrival in this country he made the plaintiff's office his headquarters, and there all his interviews and negotiations with the manufacturers of arms were had, and, as he did not speak English, these interviews and negotiations were conducted through the plaintiff.    The manufacturers soon became aware of the relation of the men to each other, and accordingly opened a correspondence with the plaintiff, or waited upon him, to secure his influence with the Bey in presenting their arms.    Among others, Winchester, the president of the Winchester Repeating Arms Company, of Connecticut, the defendant here, sought an introduction to him, and the scene is thus narrated : "Said Mr. Winchester to Oscanyan, ' Will you be kind enough to call the attention of Rustem Bey to my repeating rifle ?'    ' Well,' said Oscanyan, ' Mr. Winchester, I am receiving commissions from all parties for that favor, and I expect commissions for my services, and that is one of the ways by which I make my livelihood ; if

you can compensate me, if you can remunerate me by giving me commissions, I will use my influence for you and do all I can for you.' ' Very well,' said Mr. Winchester, ' that is all right. You shall have whatever commissions we deem proper, and we will talk the matter over and agree upon that.' Accordingly Oscanyan showed the Winchester repeating rifle to Rustem Bey," who was not pleased with it, but through Oscanyan's influence was induced to send samples of it to Constantinople.

In January, 1870, the Bey received instructions from the Turkish minister of ordnance to examine and report upon the Spencer gun. These instructions were given because the Turkish government had heard that the United States had a large number of these guns on hand which they desired to dispose of. They immediately became known to Oscanyan, and as he had agreed with Winchester to press the claims of the Winchester gun, he at once proceeded to use his influence with the Bey to condemn the Spencer gun. The opening statement says that " he raised all manner of objections that he could, and he finally did succeed in inducing " the Bey to put it aside. Then he brought out a Winchester gun, a sample of which he always kept in his office for the very purpose, whenever opportunity offered, of presenting its claims. It appears, however, that the Bey did not, from the first, like that gun, and for that reason, continues the opening statement, " Oscanyan had to use all his ingenuity and skill and perseverance and patience " to get him to look at it at all; but finally he succeeded in getting him to recommend the purchase of a thousand of them for the use of the imperial body-guard. This, said the plaintiff's counsel, was done by the Bey " in order to please Oscanyan," knowing the fact that he had an arrangement with the defendant for a commission on the sale. Accordingly the Bey reported to the Turkish government, condemning the Spencer gun and recommending the purchase of the Winchester repeating arms. Soon afterwards Oscanyan informed Winchester of what he had done, when the latter remarked that he would have allowed Oscanyan the same commissions on the Spencer guns as on the others. Oscanyan replied that the United States had a large number of them on hand, and if the Bey had reported favorably on that

gun, the Turkish government would have ordered them directly from the United States government. It was that reason, said Oscanyan, which " weighed on my mind " to persuade the Bey to condemn the gun.

In February, 1870, the Bey received fresh instructions to inquire into and report upon the price of twenty thousand repeating arms, and to send fresh samples. Oscanyan soon learned of this and immediately telegraphed for Winchester, who arrived at his office on the following day, when Oscanyan informed him that he had got an order for twenty thousand guns, or an inquiry for the price of twenty thousand, and thought he could get an order for one hundred thousand. He then called Winchester's attention to an objection raised by the Bey relating to the spring of the magazine of the rifle, and advised him to meet it; and this advice was acted upon. Soon afterwards Winchester, as president of the company, put in writing his agreement with Oscanyan, to give ten per cent upon all sales of arms of the company made to or by the latter to the Ottoman government, provided that such sales were made at prices and upon terms having his approval. This was dated on the 4th of March, 1870. On the following day a box of fresh samples was forwarded to the Turkish minister of ordnance at Constantinople, and, after a delay of some months for the receipt of the cartridges, a trial of them was had with a favorable result. Written contracts between the defendant and the Turkish government followed; one made Nov. 9, 1870, for arms to the amount of $520,000, and another made Aug. 19, 1871, for arms to the amount of $840,000.

The plaintiff claims that these contracts were procured through the recommendations which by his influence were made by Rustem Bey. His counsel stated this in his opening, and declared that no other person had possessed any influence in effecting the sales. It is for the use of this influence that the contract in suit was made and compensation is now demanded. The question then arises, Is this contract one which the court will enforce? We have no hesitation in answering it in the negative. The contract was a corrupt one, — corrupt in its origin and corrupting in its tendencies. The services stipulated and rendered were prohibited by considerations of

morality and policy which should prevail at all times and in all countries, and without which fidelity to public trusts would be a matter of bargain and sale, and not of duty.

In the first place, the plaintiff was, at the time, an officer of the Turkish government. As its consul-general at the port of New York, he was invested with important functions and entitled to many privileges by the law of nations. It is not necessary here to state, with any particularity the functions and privileges attached to the consular office. These will be found in any of the approved treatises on international law.

It is enough to observe that a consul is an officer commissioned by his government for the protection of its interests and those of its citizens or subjects; and whilst he is sometimes allowed, in Christian countries, to engage in commercial pursuits, he is so far its public agent and commercial representative that he is precluded from undertaking any affairs or assuming any position in conflict with its interests or its policy. By some governments he is invested — in the absence of a minister or ambassador to represent them — with diplomatic powers, and, as between their citizens or subjects, may also exercise judicial functions. By all governments his representative character is recognized, and for that reason certain exemptions and privileges are granted to him. In the Constitution of the United States, consuls are classed with ministers and ambassadors in the enumeration of parties whose cases are subject to the original jurisdiction of the Supreme Court, and in the treaty with the Ottoman Empire authority is given to it to appoint consuls in the United States.

It was stated in the argument that the office held by the plaintiff was an honorary one, created especially as an evidence of the high regard entertained for him by the government of his country, as if the objection to his claim of a right to exact a commission on contracts with it, made through his influence, was obviated by the fact that he received no salary for the discharge of his official duties. Assuming the office to have been purely an honorary one, we do not perceive how this circumstance could in any respect alter his relations to that government. If conferred as a mark of honor, the fact would seem to impose upon him increased obligation to avoid any departure

from the line of duty. · The members of Parliament in England receive no pay for their services, and the expenses of many official positions, in this and other countries, exceed the compensation allowed to the incumbents; but this circumstance would not excuse much less justify them in sacrificing the public interests for individual gains or profits. All such positions are trusts to be exercised from considerations of duty and for the public good. Whenever other considerations are allowed to intervene and control their exercise, the trust is perverted and the community suffers. The plaintiff, it is true, was not the purchasing agent of the Turkish government, but he was its honored officer, upon whose fidelity to its interests it had a right to rely in any advice which he might give to its agent. But so far from justifying this confidence, the only motive upon which he appears to have acted was the hope of gain to himself by high commissions on the sales effected. As justly remarked by the judge who tried the case, the benefits which would inure to the government of which he was the commercial representative, do not seem to have entered into the considerations which influenced his mind.

But, independently of the official relation of the plaintiff to his government, the personal influence which he stipulated to exert upon another officer of that government was not the subject of bargain and sale. Personal influence to be exercised over an officer of government in the procurement of contracts, as justly observed by counsel, is not a vendible article in our system of laws and morals, and the courts of the United States will not lend their aid to the vendor to collect the price of the article. Numerous adjudications to this effect are found in the State and Federal courts. This is true when the vendor holds no official relations with the government, though the turpitude of the transaction becomes more glaring when he is also its officer.

In *Tool Company* v. *Norris*, reported in the 2d of Wallace, this court held that an agreement for compensation to procure a contract with the government to furnish it with supplies was against public policy and could not be enforced. That was a case where the compensation was made contingent upon success in procuring the contract, and, as we shall hereafter show,

should be distinguished from agreements for services in presenting information on the subject for the consideration of the government. It was a case where nothing was to be paid if no contract was obtained, and if obtained the compensation was to be proportionate to its extent. In deciding the case the court said: " Considerations as to the most efficient and economical mode of meeting the public wants should alone control in this respect the action of every department of government. No other consideration can lawfully enter into the transaction, so far as the government is concerned. Such is the rule of public policy, and whatever tends to introduce any other elements into the transaction is against public policy. That agreements like the one under consideration have this tendency is manifest. They tend to introduce personal solicitation and personal influence as elements in the procurement of contracts, and thus directly lead to inefficiency in the public service and to unnecessary expenditures of the public funds. . . . All agreements for pecuniary considerations to control the business operations of the government or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptation by refusing them recognition in any of the courts of the country."

In this case the doctrine of the court in *Marshall* v. *Baltimore & Ohio Railroad Co.*, reported in 16th Howard, was emphasized. There compensation was claimed by the plaintiff for services rendered in procuring the passage of a law by the legislature of Virginia, upon a contract that if the law was not passed, or, if passed, was not accepted and adopted or used by the stockholders, no compensation should be allowed. It was held that the contract was void as against public policy. The court, speaking through Mr. Justice Grier, said: "Bribes in the shape of high contingent compensation must necessarily lead to the use of improper means and the exercise of undue influence. Their necessary consequence is the demoralization of the agent who covenants for them; he is soon brought to

believe that any means which will produce so beneficial a result to himself are 'proper means;' and that a share of these profits may have the same effect of quickening the perceptions and warming the zeal of influential or ' careless' members in favor of his bill." See also *Wood* v. *McCann*, 6 Dana (Ky.), 366; *Mills* v. *Mills*, 40 N. Y. 543.

In *Trist* v. *Child*, reported in 21st of Wallace, the distinction is drawn between the use of personal influence to secure legislation, and legitimate professional services in making the legislature acquainted with the merits of the measures desired. Whilst the former is condemned, the latter are, within certain limits, regarded as appropriate subjects for compensation. There the defendant had employed the plaintiff to get a bill passed by Congress for an appropriation to pay a claim against the United States. It was considered by the court to have been a contract for lobby services, and adjudged void as against public policy. Other similar cases were mentioned by the court, and, after observing that in all of them the contract was held to be against public policy and void, it added, speaking through Mr. Justice Swayne: "We entertain no doubt that in such cases, as under all other circumstances, an agreement, express or implied, for purely professional services is valid. Within this category are included drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them, orally or in writing, to a committee or other proper authority, and other services of like character. All these things are intended to reach only the reason of those sought to be influenced. They rest on the same principle of ethics as professional services rendered in a court of justice, and are no more exceptionable. But such services are separated by a broad line of demarcation from personal solicitation, and the other means and appliances which the correspondence shows were resorted to in this case."

So, too, with reference to furnishing the government with arms or supplies of any kind. It is legitimate to lay before the officers authorized to contract, all such information as may apprise them of the character and value of the articles offered, and enable them to act for the best interests of the country. And for such services compensation may be had as for similar

services with private parties, either upon a *quantum meruit*, or, where a sale is effected, by the ordinary brokerage commission. And here it may be observed, in answer to some authorities cited, that the percentage allowed by established custom of commission merchants and brokers, though dependent upon sales made, is not regarded as contingent compensation in the obnoxious sense of that term, which has been so often the subject of animadversion by this court, as suggesting the use of sinister or corrupt means for accomplishing a desired end. They are the rates established by merchants for legitimate services in the regular course of business. But where, instead of placing before the officers of the government the information which should properly guide their judgments, personal influence is the means used to secure the sales, and is allowed to prevail, the public good is lost sight of, unnecessary expenditures are incurred, and, generally, defective supplies are obtained, producing inefficiency in the public service.

In *Meguire* v. *Corwine*, decided at the last term, the doctrine of the above cases was approved. There an agreement to pay the plaintiff — in consideration of his appointment as government counsel — one-half the fees he might recover, was adjudged invalid. Transactions of the kind were declared to be "an unmixed evil;" and the court said that whether forbidden by statute or condemned by public policy, "no legal right can spring from such a source." 101 U. S. 108, 111.

In the present case there is no feature that relieves the contract which the plaintiff seeks to enforce from the condemnation pronounced in the several cases cited. It is the naked case of one officer of a government, to secure its purchase of arms, selling his influence with another officer in consideration of a commission on the amount of the purchase. The courts of the United States will not lend their aid to collect compensation for services of this nature ; nor does it make any difference that the Turkish government did not object to the plaintiff's taking commission on such contracts, which counsel contended we must consider as admitted together with the rest of the opening statement. We may doubt whether we are compelled to take as correct, with the facts mentioned touching the contract in court, his statement of the law or customs of other

countries. But admitting this to be otherwise, and that the Turkish government was willing that its officers should be allowed to take commissions on contracts obtained for it by their influence, that is no reason why the courts of the United States should enforce them. Contracts permissible by other countries are not enforceable in our courts, if they contravene our laws, our morality, or our policy. The contract in suit was made in this country, and its validity must be determined by our laws. But had it been made in Turkey, and were it valid there, it would meet with the same reprobation when brought before our courts for enforcement.

The general rule undoubtedly is that the validity of a contract is to be decided by the law of the place where it is made, unless it is to be performed in another country; but to this, as to all general rules, there are exceptions, and among these Story mentions contracts made in a foreign country to promote or reward the commission of crime, to corrupt or evade the due administration of justice, to cheat public agents, or to affect the public rights, and other contracts which in their nature are founded in moral turpitude, and are inconsistent with the good order and solid interest of society. "All such contracts," he adds, "even although they might be held valid in a country where they are made, would be held void elsewhere, or at least ought to be, if the dictates of Christian morality, or even of natural justice, are allowed to have their due force and influence in the administration of international jurisprudence." Story, Conflict of Laws, sect. 258.

Among such obnoxious contracts must be included all such as have for their object the control of public agents by considerations conflicting with their duty and fidelity to their principals. A contract to bribe or corruptly influence officers of a foreign government will not be enforced in the courts of this country, — not from any consideration of the interests of that government or any regard for its policy, but from the inherent viciousness of the transaction, its repugnance to our morality, and the pernicious effect which its enforcement by our courts would have upon our people. *Hope* v. *Hope*, 8 De G., M. & G. 731; *Watson* v. *Murray*, 23 N. J. Eq. 257.

In any view of the contract here, whether it would be valid

or invalid according to Turkish law and customs, it is intrinsically so vicious in its character and tendency, and so repugnant to all our notions of right and morality, that it can have no countenance in the courts of the United States.

Our conclusion, therefore, is that the third position of the plaintiff is not well taken.

It follows that the judgment of the court below must be affirmed; and it is

*So ordered.*