# JACINTO Y MAÑON, Plff.,

## *v.*

# MANUEL CERECEDO ET AL., Dfts.

---

San Juan, Law, No. 1100.

MOTION FOR DIRECTION OF VERDICT.

Contracts—Burden of Proof.
    1. In a suit upon a contract the burden is on the plaintiff to prove his case.

Contracts—Public Policy—Lottery Tickets.
    2. The dealing in lottery tickets is against the public policy of the United States, and a contract entered into in Santo Domingo

---

NOTE.—For conflict of laws as to gambling and lottery contracts, see notes in 64 L.R.A. 160, and 46 L.R.A. (N.S.) 650.

for the sale of lottery tickets will not be enforced by the courts of the United States.

Contracts—Lottery Tickets—Place of Performance.

  3. A contract entered into in Santo Domingo providing for the sale of lottery tickets in Spanish territory will not be enforced by the courts of the United States, as the dealing in lottery tickets is against the public policy of the United States, as well as against its laws and the laws of Porto Rico.

Opinion filed May 23, 1916.

*Rafael Guillermety* for plaintiff.

*Frank Martinez* for defendants.

HAMILTON, Judge, delivered the following opinion:

The complaint in this case alleges that on May 16, 1913, plaintiff and defendants entered into a contract in the city of Santo Domingo, whereby the plaintiff promised to sell to the defendant ten thousand lottery tickets for each drawing made on behalf of the "Father Bellini Orphan and Beneficence Asylum" and the "Father Bellini Insane Asylum." Then follow details as to prizes, discounts, etc. The plaintiff grants the defendant the exclusive right to sell lottery tickets "in the Spanish territory," and furthermore, Mr. Mañon will not sell to any other person except Mr. Cerecedo said lottery tickets, and will also avoid by any means at his disposal the taking to and the selling of said lottery tickets within the same Spanish territory where Mr. Cerecedo has the privilege to sell his. Then follow details as to carrying out the contract. The 10th clause is:

"Mr. Cerecedo will give Mr. Mañon a promissory note for the total amount of each series sent to the former, with the business firm Cerecedo Brothers & Company, Sucrs., as sureties. This promissory note is to be for the amount of $54,000, or the value of the lottery tickets of each drawing. Mr. Cerecedo agrees not to transact business of this kind with any person or lottery house other than Mr. Mañon himself.

The suit is brought upon that contract, and upon a promissory note of $54,000 made under the tenth clause of the contract. This note was dated May 16, 1913, and is indorsed by Cerecedo Brothers & Company, Sucrs. The note has been partially paid up to April 20, 1914, but from this date on the defendants are indebted to the plaintiff for a remaining amount of $22,956.81.

The answer need not be considered. It denies all of the allegations of the complaint, and sets up that this contract was intended for the bringing of lottery tickets into the Island of Porto Rico in violation of § 237 of the Criminal Code of the United States.

1. At the close of the plaintiff's case, which consisted entirely of the note and contract and the Civil Code of Santo Domingo,—I think that was all the evidence,—the defendant moves to direct a verdict on two grounds: First, that the plaintiff has not proved his case. The point in regard to this ground is that there is nothing to show that the plaintiff has furnished the lottery tickets under the contract on which he sues. The contract, of course, is between two people, and calls for the acts of both sides. Now has the plaintiff performed his part of the contract? I am not sure he has. There is no proof that he has furnished the lottery tickets. The only thing is, the note is to be given under the contract in connection with the furnishing of

Jacinto y Mañon v. Cerecedo.

the lottery tickets. The contract is not very clear on that point. Section 10 says that Mr. Cerecedo will give a note for the total amount of each series. That would seem to imply that some series had been sent to Cerecedo. The note itself is: "I owe and shall pay unto Dr. Jacinto y Mañon the sum of $54,000 in accordance with clause 10 of the contract." There is no evidence that the goods spoken of had been furnished; but it might very well be that the matter should go to the jury, for them to draw any inference they might think proper from the fact that the note was actually given. The note was one thing, and the contract another. If this stood alone there would probably be enough to go to the jury, but there is a second ground which will have to be considered.

2. It is this, as to whether this contract, supposing it had been carried out, was or was not against the public policy of the United States. There is no doubt that a contract made in one jurisdiction can be enforced in another, provided there is nothing wrong about the contract itself. The fact that it is a contract which covers other things than could arise in the country where it is to be enforced, makes no difference. For instance, a contract to furnish logwood from Santo Domingo could be enforced in the United States. The logwood not growing in the United States, but growing in Santo Domingo, all the conditions which would apply in one country would be enforced in another country. This, however, is of a different character. It is not a question of conflict of laws. It is a question of the use of the courts of the United States to carry out something which is contrary in the United States to the policy of the United States. It has come up a number of times. There is no question if it is not one of public policy. If it was simply a con-

tract, that would be all right, but a number of cases have come up in the courts on the subject, some of which seem to furnish an analogy.  For instance, in the United States, for reasons of public policy, with which some people heartily agree and some do not agree, in the states where at one time slavery was permitted it is not now lawful for a white person and a negro to intermarry, and the fact that such a marriage is contracted in one of the states where there is no such law makes no difference when the couple goes back into the state where such a marriage is forbidden.  That has come up in the case of State v. Kennedy, 76 N. C. 251, 22 Am. Rep. 683, and there are cases in Alabama and elsewhere.  That is where a contract is forbidden on the ground of public policy.  In New Jersey there was a case where certain persons had obtained lottery franchises from different states, and entered into a partnership for the conduct of the lotteries and the division of the profits.  One of them filed a bill in a New Jersey court for the dissolution of the partnership and the sale and distribution of the assets.  The bill was dismissed, the court stating: "Assuming that all the contracts and transactions involved in it occurred in states where they were tolerated by law, my opinion is that this court will not undertake to enforce or administer them."  It does not undertake to say that the contract is void or not void, but simply that the court of New Jersey would not undertake to carry out something which was forbidden by the laws of New Jersey to be done.  Watson v. Murray, 23 N. J. Eq. 257.  It seems to me that that case is strictly in point,—is this case over again.  In England it has been decided the same way; where the agreement is one which violates a fixed public policy, it will not be enforced.  An English chancellor expressed it this way: "It

Jacinto y Mañon v. Cerecedo.

appears to me, however, plain, on general principles, that this court will not enforce a contract against the public policy of this country, wherever it may be made. It seems to me almost absurd to suppose that the courts of this country should enforce a contract which they consider to be against public policy, simply because it happens to have been made somewhere else." That is the case of Rousillon v. Rousillon, L. R. 14 Ch. Div. 351, 369.

There are a number of illustrations of this: Agreements involving champerty, in restraint of trade; agreements to influence a public official; agreements to bind the liability of a common carrier for negligence; agreements compounding crime, and others. One of these cases happens to relate to Turkey, and is this: The plaintiff, an officer in the Turkish government, had made a contract with the defendant, a manufacturer of firearms, under which he was to receive a commission on such as he could induce that government to purchase. In a suit on the contract it was held by the Supreme Court of the United States that, even were the contract made in Turkey and valid there, the Turkish government being willing that its officers should receive bribes for official action, yet, contracts of this kind being against the public policy of this country, they would not be enforced in our courts. Oscanyan v. Winchester Repeating Arms Co. 103 U. S. 261, 26 L. ed. 539, 9 Cyc. 679.

3. I have discussed this point entirely on the plaintiff's theory of the case. The plaintiff's theory of this case is that it is a contract for the sale of lottery tickets in Spanish territory, which is not United States territory; in other words, that it is for the sale in Spain or some other Spanish territory, and the law of the United States has nothing to do with the place of

Jacinto y Mañon v. Cerecedo.

carrying out the contract. It seems to me that, discussing it on that theory, the result is plain, and it is not necessary to take up any question as to what the intent of the contract was. That would be a matter of proof which has not come up. So I see no escape from the conclusion that, both from the local law of Porto Rico as to lotteries, and the law of the United States as to bringing lottery tickets into Federal territory, a contract relating to the sale of lottery tickets is against public policy, and that it would not be right; it would be contrary to the object of United States courts for this court to sit here and enforce a contract for the sale of lottery tickets, no matter where it is in the world. Whether recognized in the country where the contract is made, or recognized in the country where the contract is to be performed, the part of the performance which happens to be in the United States right now is the payment of this money, and that part this court does not think it can carry out. It feels bound to grant the motion to direct a verdict. In doing this, as in a good many cases, it is a great relief to me to feel that what I do can be reviewed; that it is not a case, as it used to be, that what I did was final, up to a certain amount.

I will grant the motion.