## HECHT CO. v. WHITEFORD.
### No. 8246.

United States Court of Appeals for the District of Columbia.

Argued April 9, 1943.

Decided Aug. 16, 1943.

Mr. Lawrence Koenigsberger, of Washington, D. C., with whom Mr. Austin F. Canfield, of Washington, D. C., was on the brief, for appellant. Mr. Eugene Young of Washington, D. C., also entered an appearance for appellant.

Mr. James C. Wilkes, of Washington, D. C., with whom Mr. James E. Artis and Mr. Walter R. Schoenberg, both of Washington, D. C., were on the brief, for appellee.

Before EDGERTON and ARNOLD, Associate Justices, and EICHER, Chief Justice of the District Court of the United States for the District of Columbia, sitting by designation.

ARNOLD, Associate Justice.

The main facts in this case are not in dispute. Appellant, the Hecht Company, owned a large warehouse which was to become vacant. In February, 1936, it retained appellee, Whiteford, a real estate broker, to sell or find a tenant for the property. Whiteford's agency was not exclusive and other brokers were retained for the same purpose. Since the property was in Washington, Whiteford's first and obvious move was to interview an employee of the government's Office of Space Control. He promptly did so. Some months later he took another Space Control employee out for a casual inspection of the property.

The Office of Space Control is in effect a real estate office set up by the government to serve the vast number of agencies, departments, boards and divisions of the government which need building space. It performs for these divisions of the government the services ordinarily rendered by a real estate broker to his clients. Government agencies are compelled to close all contracts for space through the Office of Space Control. However, since the agencies that require space are more aware of their own needs than an outside department, they often call up private brokers directly to find out what is available.

Accordingly, in August, 1936, a real estate broker named Rosinski received a call from the Social Security Board for in-

formation as to available space. Rosinski knew the Hecht building was for rent so he got in touch with Whiteford. Through the joint efforts of Whiteford and Rosinski a proposal (which never ripened into an offer) was made to lease the building for the occupancy of the Social Security Board. The rental was $38,000 a year but alterations which would cost about $135,000 were required before the Social Security Board would take possession. The Hecht Company declined to consider the proposal.

This is the only proposal which was procured by Whiteford, or with which Whiteford had anything to do. In the meantime other agents who had been requested by the Hecht Company to search for a tenant had contacted the Office of Space Control without success. There is no evidence that Whiteford or any other agent spent any substantial time or used any special knowledge in dealing with the government.

Finally the Office of Space Control, dealing directly with Hecht, leased the property for the Government Printing Office. The rent was $38,000. The offer differed from the Social Security Board proposal in that instead of requiring a large expenditure before occupancy, only slight improvements were necessary.

On the basis of these facts, the jury found Whiteford was entitled to a commission of 5% of the $38,000 annual rental so long as the Government Printing Office or any other agency of the government occupies the premises. The commission given by the judgment below amounted to $5,447.04. The effect of the decision enables appellee to collect further commissions during the occupancy of the property by the Government Printing Office at the rate of $1,900 a year.

■ Ordinarily a broker must complete the lease before he is entitled to a commission. Nevertheless, where the broker is the procuring cause of a lease to a particular customer the owner cannot prevent the broker's full performance, by completing the performance himself, without paying a commission.[1] But in such a case the burden of proof is always on the broker to show that he is the procuring cause of a lease subsequently made by the owner.[2]

■ We find no evidence in the record to support a finding that Whiteford was the procuring cause of the lease made by the Office of Space Control on behalf of the Government Printing Office. The only proposal which Whiteford was instrumental in obtaining was from the Social Security Board, which the owner declined to accept.[3] It is true that Whiteford was the first to call the property to the attention of the Division of Space Control, the office which subsequently negotiated a lease with the owner. In some cases there may be an inference of fact that a broker who has introduced an individual customer to the owner is the procuring cause of subsequent dealings between that customer and the owner[4] since without the special service of the broker the owner might never have met the customer. But such an inference can hardly be made where the "customer" introduced by the broker is the Office of Space Control, a large government real estate service generally

[1] Moore & Hill, Inc., v. Breuninger, 1909, 34 App.D.C. 86, 91; Mechem, The Real Estate Broker and His Commission, 6 Ill.L.Rev. 145, 313, and cases cited ibid., n. 64.

[2] Battle v. Price, 1934, 63 App.D.C. 326, 72 F.2d 377; Wardman v. Washington Loan & Trust Co., 1937, 67 App.D.C. 184, 186, 90 F.2d 429; See Goldsmith v. Buckey, 1933, 62 App.D.C. 61, 62, 64 F.2d 559.

[3] In Battle v. Price, supra, 63 App.D.C. at page 327, 72 F.2d at page 378, this court said: "* * * To become entitled to a commission, a broker must find a purchaser who is able and willing to buy on the identical terms offered by the seller. * * * It is true that the plaintiff first introduced the eventual purchaser to the defendant, but this circumstance alone, though significant, is not determinative, in the present circumstances."

[4] See Note, 36 Harv.L.Rev. 875 (1923), "Thus, although ordinarily it is not enough that the broker merely introduce the purchaser to the principal, it is easily conceivable that introduction might be sufficient." Contra, Arent Co. v. Cinnamon, Sup.Ct. App.Term, 1921, 188 N.Y.S. 86, 87, a case in which the court refused to allow a broker's commission where the broker had introduced the customer and the owner completed the sale, saying: "The broker may have introduced to each other parties who otherwise would have never met; he may have created impressions which under later or more favorable circumstances would naturally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no legal claim for commission."

known to be searching for space on behalf of other government agencies and dealing with a large number of property owners and real estate brokers.

In any event, if such an inference ever arose here it is rebutted. Whiteford's first contact with Space Control was in February, 1936, when he saw the Chief of that office, Guthridge. Guthridge was not much interested because the building was not then available for occupancy. The next contact Whiteford made with Space Control was in April, 1936, when he took another employee of that office to the Hecht warehouse. Only a casual examination was made since the building was still not available. Whiteford filed no listing or report in writing with Space Control. There was no evidence that either of these episodes had anything to do with bringing about the lease that was ultimately signed. There is strong evidence to the contrary. Jawish, an independent broker, brought the warehouse to the attention of the Office of Space Control and formally listed the property there in May, 1936. In the fall of 1936, Russell, of the Office of Space Control, inspected the property with Jawish and made a report to the chief, Guthridge. The members of the Space Control staff who were concerned in the transaction positively testified that Whiteford had no part in the chain of causation which resulted in the lease to the Government Printing Office. They made it clear that if any broker caused them to get in touch with the Hecht Company, it was not Whiteford but Jawish.[5]

The appellee, Whiteford, had also the burden of proving that the commission claimed represented the fair and reasonable value of the service. The service alleged to have been rendered consisted simply in discovering that the government needed office space and calling its attention to the property. For this trifling effort the compensation allowed amounted to $5,447.-04 at the time of the verdict, and would accumulate at the rate of $1,900 a year so long as the government occupies the property. The testimony to support this large fee is based on a schedule made up by a combination of private real estate agents. However, in view of the failure of appellee to produce substantial evidence that he was the procuring cause of the lease, we need not decide whether a fee which appears on its face to be unconscionable can nevertheless be upheld as reasonable when it is supported by such testimony.

Nor need we decide the equally doubtful question whether public policy justifies a contingent fee in procuring a government contract where the fee has no relationship to the actual value of the services. The Supreme Court of the United States on one occasion positively asserted that contingent fees for soliciting executive action were contrary to public policy.[6] Though this was a dictum it was not inadvertently said. It is true that in a later dictum the Supreme Court exempted from this rule "the percentage allowed by established custom of commission merchants and brokers, though dependent upon sales made."[7] It is a fair assumption in the light of the Providence Tool case that this dictum applies to such customary brokers' fees as bear an actual relationship to the value of the work performed,—not to speculative windfalls which the broker is to receive if he is successful in soliciting executive action. To extend this dictum to the latter type of brokers' fees would overrule the reasoning of the Providence Tool case. The facts of this case, however, do not require us to consider that question.

The judgment should be reversed on the ground that the evidence is not sufficient for the jury to find that appellee, Whiteford, was the procuring cause of the lease.

Reversed.

---

[5] In Taylor v. Maddux, Marshall & Co., Inc., 1925, 55 App.D.C. 254, 4 F.2d 447, 448, where competing brokers were involved, the lower court gave judgment for commission to the broker who had first taken the ultimate purchaser to see the property. The sale was made by another broker. In reversing the judgment this court said: "Taking the plaintiff's case in its most favorable light, it amounted merely to a competition between two agents for the sale of the premises. It is well settled that, in the absence of collusion between the owner and the purchaser, there can be no recovery by an agent who has failed in such a competitive race."

In Whitcomb et al. v. Bacon, 1898, 170 Mass. 479, 49 N.E. 742, 64 Am.St.Rep. 317, the court points out that a different rule than the one above stated by this court might allow two brokers to recover commissions on the same sale.

[6] Providence Tool Co. v. Norris, 1865, 2 Wall. 45, 17 L.Ed. 868.

[7] Oscanyan v. Winchester Repeating Arms Co., 1881, 103 U.S. 261, 276, 26 L. Ed. 539.

EICHER, Chief Justice of District Court (dissenting).

We are considering an appeal from a money judgment based upon the verdict of a jury rendered in an action ex contractu. The appellant in its Brief, page 2, presents to us the following questions for decision:

1. Whether there was sufficient evidence to warrant a submission to the jury of the issue of whether the plaintiff was the procuring cause of the lease, so as to entitle him to a commission.

2. Whether it is consistent with public policy to allow a broker a commission contingent upon his obtaining the entering into of a lease to the Government of the United States.

3. Whether the statute of limitations is pleadable to an amended declaration which changes the plaintiff's claim from reliance on an express, to reliance on an implied contract.

4. Whether it is error for the trial court to refuse to read instructions to the jury which have been granted by the court and which have been read to the jury by counsel in the course of his closing argument.

5. Whether the District Court erred in excluding certain proffered testimony.

The majority opinion answers question number one in the negative; discusses, without deciding, question number two; ignores questions three, four and five; and discusses a collateral question that was not raised by the appellant either in the trial court or on this appeal regarding the sufficiency of the evidence to support the amount of the commission found by the jury.

Careful reading of the majority opinion persuades me that, in arriving at their decision that the issue of procuring cause should not have been submitted to the jury the majority have deviated farther from the strict letter of the Seventh Amendment to the Constitution than is warranted by the interpretative decisions of this Court and of the Supreme Court.

The Seventh Amendment reads: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

In Jackson v. Capital Transit Co., 69 App.D.C. 147, at page 148, 99 F.2d 380, at page 381, this Court said: "On a motion for a directed verdict it is well settled that the evidence must be construed most favorably to the plaintiff; to this end he is entitled to the full effect of every legitimate inference therefrom. If upon the evidence, so considered, reasonable men might differ, the case should go to the jury; if, on the other hand, no reasonable man could reach a verdict in favor of the plaintiff, the motion should be granted."

In Gunning v. Cooley, 281 U.S. 90 at page 94, 50 S.Ct. 231, at page 233, 74 L.Ed. 720, the Supreme Court said: "Where uncertainty as to the existence of negligence arises from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury." And from Berry v. United States, 312 U.S. 450, at page 453, 61 S.Ct. 637, at page 638, 85 L.Ed. 945, I quote: "[Rule 50 (b)] has not taken away from juries and given to judges any part of the exclusive power of juries to weigh evidence and determine contested issues of fact—a jury being the constitutional tribunal provided for trying facts in courts of law."

In the recent decision by the Supreme Court in Galloway v. United States, 63 S. Ct. 1077, 1089, 87 L.Ed. ——, Mr. Justice Rutledge, speaking for the Court, phrases it: "The essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked. * * * That guaranty (the Seventh Amendment) requires that the jury be allowed to make reasonable inferences from facts proven in evidence having a reasonable tendency to sustain them."

Were this a non-jury action, triable by us de novo on the facts and the law, it is entirely possible that after carefully weighing all the evidence, I might agree with the majority that the defendant should have prevailed. But my concept of the traditional function of the jury as trier of the facts requires that I avoid weighing all the evidence and resist the consequent temptation to substitute my own judgment for that of the jury. At the outset of their opinion the majority say: "The main facts in this case are not in dispute." What boots it, if, as held in Gunning v. Cooley, supra, fair-minded men might honestly draw different conclusions from such un-

disputed facts? Furthermore, it is not the undisputed facts alone that we are called upon to appraise, but all the facts, disputed and undisputed, that are favorable to the appellee, or from which inferences favorable to him might be drawn by reasonable minds.

Therefore, may I ask: Are the premises of the majority on which they base their conclusion in harmony with the settled rules to which the Courts in this jurisdiction are committed? Do they consider the record from the point of view that is most favorable to appellee, without giving weight to denials or rebuttals, and have they considered not alone "the main facts that are not in dispute" but also all the others in the record together with all "reasonably possible inferences drawable therefrom favoring the party whose case is attacked."

Upon examination of the majority opinion in the light of the foregoing inquiries, we find the following: They say there was no evidence that either of these episodes (Whiteford's visit to Guthridge in February 1936, and his visit to the warehouse with McAllister in April) had anything to do with bringing about the lease that was ultimately signed. They follow this by saying, "There is strong evidence to the contrary." Also, they say, "such an inference (of procuring cause) can hardly be made when the 'customer' introduced is the Office of Space Control, a large government real estate service * * * searching for space on behalf of other government agencies." They follow this by saying, "If such an inference ever arose here, it is rebutted." Then final reliance is placed upon what they say is the positive testimony of the Space Control staff that Whiteford had no part in the chain of causation which resulted in the lease to the Government Printing Office.

The foregoing quotations, it seems to me, indicate a character of review that is quite inconsistent with the above mentioned "favorable evidence" rule. As Morgan v. Adams, 29 App.D.C. 198, at page 207, forcefully admonishes: "It is not within the province of an appellate court to pass upon the weight to be given the evidence as a whole, any more than upon the credibility of the several witnesses."

But of still greater importance is the fact that the two episodes referred to by the majority were by no means all the evidence heard by the jury bearing directly,

indirectly, or reasonably inferentially upon the question whether appellee was the procuring cause of the lease entered into between the appellant and the Government Printing Office. Appellee in his brief summarizes the evidence which he claims, and the trial court held, "definitely permitted an inference that the appellee originated or set in motion, without break in their continuity, direct negotiations between the appellant and the United States Government which resulted in, or produced, the entry into the lease agreement." I have carefully checked the summarized facts against the record which, I am convinced, amply supports them. I quote from appellee's brief as follows: "the submission of Appellant's property to Guthridge in February, 1936, and the inspection of the property around the middle of April, 1936, by McAllister; that, according to the latter's statement, the property had never been offered to him or to Space Control prior to the time of his inspection; that McAllister at that time discussed the property with his Chief, Guthridge, and that such discussion,—independent from Appellee's discussion with Guthridge between February 15 and 17, 1936—was 'among the sources' of Guthridge's information of the availability of the property,—leading to the compelling conclusion, since no other submission by other brokers had occurred prior thereto, that this 'source' must, of necessity, have been the first causa movens—; that Appellee's efforts to obtain the Appellant's approval of a United States' tenancy at the legally permissible rent were frustrated by Appellant's consistent and categorical denial of its consent, while,—leaving the Appellee in ignorance thereof—, direct negotiations were had with the Federal Government; that the final climatic statement by Quirk, as alleged by the Appellee, but denied by the former, to the effect that the Appellee had ultimately convinced the Appellant 'that it was the best thing to do', which statement would seem to be an adequate and very plausible expression of what Quirk himself testified was the cause of his change of mind with respect to a government tenancy, to wit, 'it was the best we could do with it.'"

Quite evidently, therefore, the Space Control staff did not "positively testify" that Whiteford had no part in the "chain of causation", as is assumed by the majority. It is likewise significant that the direct negotiations between appellant and the

Government may have been initiated by the appellant through a telephone call to Guthridge, for Guthridge was unable to recall whether he called Quirk or vice versa. If it was Quirk who placed the call, as the jury had the right to find, there can be no doubt of his knowledge of appellee's continuing efforts pursuant to his contract of employment with appellant.

The majority concede that where the broker is the procuring cause of a sale to a particular customer, the owner cannot prevent the broker's full performance by completing the performance himself, without paying a commission. But they stress burden of proof and cite cases involving competing brokers where a commission had already been paid to a broker other than the plaintiff and where the defendant's good faith was not questioned. In this case no other broker helped close the deal. The evidence mentions one Jawish as having shown the warehouse to the government several months after plaintiff had done so. There is no intimation in the record that Jawish claimed or received a commission. Furthermore, he had died before the trial.

The rule of law goes farther than the majority's concession. This Court is firmly committed to the proposition that where a customer is interested by a broker in a particular property and thereafter consummates the transaction by completing negotiations directly with the owner, the broker may be regarded as the procuring cause of the deal, even though the owner is ignorant of it at the time and notwithstanding that he sells it at a price and upon terms different from those mentioned to the broker. Bryan v. Abert, 3 App.D.C. 180; Clark v. Morris, 30 App.D.C. 553; Simms v. Booth, 42 App.D.C. 263; Du Perow v. Groomes, 42 App.D.C. 287; Shoemaker v. Digges, 46 App.D.C. 206; Moore & Hill v. Breuninger, 34 App.D.C. 86 at page 91.

In other words, introduction by broker, followed by sale or lease by owner direct to the introducee, makes a prima facie case for the jury, provided there has been no independent intervening cause, nor abandonment of his employment by the broker. The majority not only overlook this rule, but create an exception to it where the customer introduced is the United States Government when they hold that because of its many departments and agencies there is less reason for the inference that intro-

duction to one department is the cause of lease subsequently made to another department. But in this case the Government was represented by its Office of Space Control, both as the introducee and finally as the intermediary that brought the appellant and the Government Printing Office together. How, then, is the admitted inference rebutted? The majority's observation runs squarely contra to the holding in Simms v. Booth, supra, where a son-in-law was the introducee and the father-in-law became the purchaser by direct negotiation with the owner, that it was for the jury to determine whether owner knew (notwithstanding his denial) that the purchaser was the father-in-law of the broker's introducee.

Throughout the majority's opinion runs the novel assumption that no procurement should be found, and no obligation, either express or implied, to pay compensation should arise where the Government becomes either the tenant or purchaser—apparently on the ground that everybody knows the Government to be a potential customer for any kind of property and that, therefore, no compensable service is rendered to a private owner by bringing the availability of his property to the attention of Government officials. Granting, arguendo, that there is such general knowledge, under existing war-time conditions, in the District of Columbia, was it true here in 1936, or is it true now outside the District of Columbia and its metropolitan area? The alternative to jury resolution, under proper instructions, of all such varying factual situations, is one rule of law for this jurisdiction and another rule for all jurisdictions outside the Nation's Capital. I cannot believe the majority would consciously defend a rule of law based on such vacillating standards or of such accidental applicability.

The majority appears to stress in this connection the fact that the only proposal appellee was instrumental in obtaining was from the Social Security Board. This seems to me to be without relevance on the issue of procuring cause. It may have some bearing, however, on the alleged excessiveness of the commission allowed by the jury, for it points up the collateral effort, sometimes more and sometimes less, required of brokers by reason of the nature of their business which yields compensation only for successful effort. This observation, I believe, answers the majority's criticism that the jury's conclusion as to

the reasonable value of the services rendered is not sustained by the evidence. Had this been a contract of employment whereby the appellee undertook to lease this warehouse to the Government Printing Office and no one else it may be the courts would be justified in holding the jury to strict standards of quantum meruit. But here the appellant insisted from the beginning upon a private tenant and for fifteen months the appellee tried to find it one—by signs on the building, by newspaper advertisements, and who knows how many contacts with clients—all the while advising the appellant that the Government would be its more likely customer, and concededly being the first broker to notify the Government of the building's availability. So, even if this point were properly before us on this appeal (see Depina v. United States, ——, U.S.App.D.C. ——, 137 F.2d 673, decided June 4, 1943), I would hesitate to over-ride a jury's verdict that is within the evidence.

In arriving at the amount of their verdict the jury had the right, also, to give weight to Quirk's persistent refusal, in all his talks with Whiteford and Rosinski, to consider a rental of less than Fifty Thousand Dollars, whereas the Government was limited by law to a rental payment of not more than fifteen percent of the property's assessed valuation, such maximum amounting to Thirty Eight Thousand Four Hundred Forty-Nine and 92/100th Dollars. The only encouragement Quirk gave them to work for a Government tenant throughout the entire year 1936 was to suggest that they persuade the District of Columbia Assessor to raise the assessed valuation of the warehouse to an amount that would permit the Government legally to pay the Fifty Thousand Dollars rental that he demanded. The refusal of Whiteford and Rosinski to do this may have been deemed quite proper by the jury.

Without commenting on the business ethics inherent in such a proposal, I suggest merely that the jury had the right to consider these circumstances not alone in determining the issue of procuring cause, but also in weighing the value to the appellant of the original contact appellee made for it with the Government, which contact the appellant availed itself of when it took the negotiations into its own hands at a time when appellee was, with appellant's consent, still trying to rent it floor by floor, and itself closed the deal with the Government at the amount it could legally pay.

In the light of the foregoing considerations, I do not believe the courts ought to limit the jury to a mere per diem basis for the computation of reasonable compensation. In 9 C.J. p. 580, the general rule is stated as follows: "In the absence of a special agreement, the broker is entitled to a reasonable compensation, and this usually depends on the amount allowed by custom and usage locally prevailing among the particular class of brokers in question." See also 12 C.J.S., Brokers, § 78.

In any event, common knowledge suggests that the exigencies of closing the deal do not invariably permit collection of the so-called prevailing percentage. Furthermore, it appears in the record that appellant had employed appellee before, from which relationship it may be assumed the appellant was aware of the amount of compensation it would be expected to pay in the event of appellee's successful execution of his commission "to plan for the disposal of the G Street warehouse" in this case. Certainly it is not for the courts in a law action to assume guardianship over parties sui juris in the negotiation of their contracts. To avoid liability for unconscionable compensation such parties need only to exercise due care in fixing the terms of the oral or written contracts by which they elect to bind themselves. And, to repeat my opening observation on this phase of the majority opinion, appellant's able counsel requested no review in this court on the ground that the verdict was excessive or unconscionable, and it may be presumed that the evidence on the subject is not fully set out in the appellate record.

There remains for consideration the majority's discussion of the second question propounded to us by appellant, to wit, the public policy aspects of a contingent fee for obtaining a contract of tenancy from the Government. Although the point is not decided, I feel the majority's critical comments warrant a presentation of my views.

The appellant asks us to apply to the facts in the case at bar the grounds of decision found in Providence Tool Co. v. Norris, 2 Wall 45, 17 L.Ed. 868; Oscanyan v. Winchester Repeating Arms Co., 103 U.S. 261, 26 L.Ed. 539, and Crocker v. United States, 240 U.S. 74, 36 S.Ct. 245, 60 L.Ed. 533. But what were the facts in those cases? A contract to manufacture

Civil War muskets in the Tool Company case, to manufacture guns for the Turkish Government in the Oscanyan case, and to manufacture satchels for the Post Office Department in the Crocker case—all articles that presumably could not be sold in volume to any other customer than a government, and such government sale being the agent's only opportunity for collecting a commission out of the subject matter of the contract. By contrast, the subject matter in the case before us is improved real estate, adaptable for use in the conduct of private business or public business. And the appellee is an established real estate dealer, holding himself out to render commercial services as a middleman between sellers and buyers, landlords and tenants, for private as well as government clients. According to the testimony of Mr. Guthridge it would seem to be common practice for real estate brokers to list with his office, for governmental information, privately owned properties that are available for rent or purchase by the government.

The record is barren of all bases for even an inference that appellee should or did use any influence, undue or otherwise, upon Guthridge or any other official of the United States Government, nor is any circumstance discernible in the entire transaction, including the relationships of all the parties, suggesting any inducement operating upon the public officials concerned other than the good faith needs, the business advantage, and the actual best interests of the government. Appellant's insistence in another division of its brief that appellee as a matter of law should be held to have done nothing to earn a fee, brings weight to such an appraisal of the record.

It is true that in the Tool Company case the Supreme Court went beyond its facts to declare that "there is no real difference in principle between agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments," and to hold broadly that a contract to give any agent compensation dependent upon his success in procuring a public contract was necessarily illegal. In the Oscanyan case, however, the Supreme Court substantially narrowed the sweeping generalizations that are found in the Tool Company case opinion by saying (103 U.S. at page 276, 26 L. Ed. 539): "And here it may be observed, in answer to some authorities cited, that the percentage allowed by established custom of commission merchants and brokers, though dependent upon sales made, is not regarded as contingent compensation in the obnoxious sense of that term, which has been so often the subject of animadversion by this court, as suggesting the use of sinister or corrupt means for accomplishing a desired end. They are the rates established by merchants for legitimate services in the regular course of business."

In Sec. 563, Restatement of the Law of Contracts, the Tool Company case dictum is also expressly repudiated: "The fact that the compensation fixed in a bargain for efforts to secure legislation or official action is contingent on success, is not conclusive evidence that improper means are contemplated in securing the desired results."

The Supreme Court took its final step away from any absolute interdict on contingent compensation when in Steele v. Drummond, 275 U.S. 199, 48 S.Ct. 53, 54, 72 L.Ed. 238, it said:

"And it is a matter of great public concern that freedom of contract be not lightly interfered with. * * * It is only in clear cases that contracts will be held void. * * * Detriment to the public interest will not be presumed, where nothing sinister or improper is done or contemplated. * * *

"The claims there considered" (referring to a list of cases including the Oscanyan case) "were under contracts requiring or contemplating the obtaining of legislative or executive action as a matter of favor by means of personal influence, solicitation, and the like, or by other improper or corrupt means."

Again, the evolution in judicial pronouncement on this subject is recognized in Restatement of the Law of Contracts, Sec. 562, as follows: "A bargain to endeavor to secure a public contract by presenting to the official having power to make the contract inducements, except such as relate to the desirability on public grounds of entering into the contract, is illegal; but if no influences other than these are bargained for or contemplated, the bargain is not illegal."

Because it states so cogently what I believe to be the rule in federal jurisdictions as well, I quote the following from the New York case of Swift v. Aspell & Co.,

40 Misc. 453, 82 N.Y.S. 659, 660: "A person having something to sell has the right to sell it through an agent, and this right is an incident to his ownership. To declare that he may not employ any agent, upon commission, where the government is the prospective buyer, is to take away what is ordinarily one of the elements of the enjoyment of ownership—the unrestricted right to sell. Upon this line of reasoning, commission agreements for a sale to the government have been upheld and enforced in this state where the agreement did not actively require corruption in its performance. Treated as a matter distinct in its nature from agreements to procure legislation, an agreement to compensate an agent for his successful efforts in traffic with the government has been held binding, where unfairness in the dealings or an intention to resort to corruption did not actually appear from the facts."

The analysis I have made is in accord with the conclusion arrived at by this court in J. E. Hanger v. Fitzsimmons, 50 App.D.C. 384, 273 F. 348, 350. With reference to the Oscanyan case it was there said: "We think counsel have misconceived the scope of Oscanyan v. [Winchester Repeating] Arms Co., 103 U.S. 261, 26 L.Ed. 539, cited by them. There an attempt was made, by an official of a foreign government, to recover upon a contract for the personal influence of that official with another official of his government. The court characterized that contract as corrupt in its origin and tendencies. Here, however, the contract on its face is legitimate, and free from all taint or suspicion, for it simply provides for the services of an agent, and the evidence is in harmony with the terms of the contract. * * * The only influence contemplated by the contract was the proper influence of a salesman."

And, finally, I find nothing in the opinion of this court in Gesellschaft, etc., v. Brown, 64 App.D.C. 357, 78 F.2d 410, that is in any way inconsistent with its pronouncements in the Hanger case.

Hence, I would find no illegality in the contract involved in this record and do not join in the doubts raised by the majority opinion.

Appellant's third, fourth and fifth points I find to be without merit. I would affirm the judgment of the court below.